FILED: APPELLATE DIVISION - 1ST DEPT 03/21/2022 09:26 PM

NYSCEF DOC. NO. 8

2022-01131

RECEIVED NYSCEF: 03/25/2022

To be argued by: **Mitchell C. Shapiro**
*Time Requested for Argument: 15 Minutes*

**Appellate Division Case No.: 2022-01131**

# New York Supreme Court

## APPELLATE DIVISION – FIRST DEPARTMENT

ATX DEBT FUND 2, LLC,

*Plaintiff-Respondent,*

-against-

NATIN PAUL a/k/a NATE PAUL,

*Defendant-Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

MCSHAPIRO LAW GROUP PC
*Attorneys for Defendant-Appellant*
16 Middle Neck Road, #207
Great Neck, New York 11201
(917) 446-3628
mcs@mcshapirolaw.com

J. SINGER LAW GROUP, PLLC
*Attorneys for Defendant-Appellant*
165 Broadway, 23rd Floor
New York, New York 10006
(917) 806-5832
jsinger@singerlawgroup.com

*Printed on recycled paper*

*New York County Clerk's Index No. 650728/2020*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.........................................................................iii

PRELIMINARY STATEMENT ................................................................. 1

QUESTIONS PRESENTED ...................................................................... 10

THE UNDERLYING CONTROVERSY AND THE DECISION BELOW ............. 14

    I.      Relationship of the Parties and the Loan Documents .......................... 14

    II.     Ladder/ATX Fraudulently Misrepresent that the Properties are
            Undersecured to Pave the Way to Rigged Foreclosure Sales ............... 17

    III.    ATX's May 2021 Foreclosure Attempt and the $90,500,000
            Voided Sale of Silicon Hills Property ................................................ 21

    IV.    ATX's Attempts To Take Title to the Silicon Hills Property and
            The Properties Through Rigged Foreclosure Sales in June 2021 ......... 22

    V.      Procedural History of the Action ........................................................ 32

    VI.    Motion to Strike Affirmative Defenses and Cross Motion (003).......... 34

    VII.   Discovery Disputes and Denial of Motion to Stay................................ 35

    VIII.  Motion 005 – ATX's Summary Judgment Motion .............................. 39

    IX.    Motion to Strike the Note of Issue/Certificate of Readiness (008)....... 41

    X.      Motion Seq. 009 – Application For Stay Pending Appeal.................... 41

    XI.    Omnibus Order .................................................................................. 43

ARGUMENT ....................................................................................... 44

    POINT I:
    APPLICABLE LEGAL STANDARDS........................................... 44

POINT II:
THE IAS COURT ERRED IN NOT FINDING THAT THE
GUARANTOR'S DEFENSES FALL WITHIN THE GUARANTY
WAIVER CARVEOUT OF WILLFUL MISCONDUCT BY LENDER
AND ARE UNWAIVABLE AS A MATTER OF LAW .................................. 44

POINT III:
MOTION 003 – THE IAS COURT ERRED IN DISMISSING ALL
AFFIRMATIVE DEFENSES ........................................................................... 49

POINT IV:
MOTION  005 – THE IAS COURT ERRED IN GRANTING ATX2
SUMMARY JUDGMENT ............................................................................... 52

POINT V:
MOTION  008 – THE IAS COURT ERRED BY NOT STRIKING THE
NOTE OF ISSUE ............................................................................................ 55

POINT VI:
MOTION  009 – THE IAS COURT ABUSED ITS DISCRETION BY
NOT EVEN CONSIDERING A STAY OF THE PROCEEDINGS OR
SIGNING THE OSC ON MOTION009 AND ISSUING THE
OMNIBUS ORDER WITHOUT ORAL ARGUMENT ................................. 57

CONCLUSION ....................................................................................................... 59

PRINTING SPECIFICATIONS STATEMENT ........................................................ 61

TABLE OF AUTHORITIES

**Cases:**

*534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick,* 90 AD3d 541 [1st Dept 2011].................................................................................................................... 50

*Adam v. Cutner & Rathkopf,* 238 AD2d 234 [1st Dept 1997] ................................... 53

*Alvarez v. Prospect Hospital,* 68 NY2d 320 [1986].................................................... 53

*Federal Deposit Ins. Corp. v. Frank L. Marino*, 74 A.D.2d 620 [2d Dept 1980]........................................................................................................ 45, 46, 47

*In re Futterman*, 602 B.R. 465 [Bankr SDNY Apr. 24, 2019]........................ 46, 48, 49

*Lease Fin. Grp., LLC v. Qazi,* 56 Misc3d 944 [Civ Ct, NY County 2017] ............... 54

*Lewis v. US Bank N.A.,* 186 AD3d 694 [2nd Dept 2020] ........................................... 51

*Matter of Tenenbaum,* 81 AD3d 738 [2d Dept 2011] .......................................... 57, 58

*MBIA Ins. Corp. v. Greystone & Co., Inc.,* 74 AD3d 499 [1st Dept 2010] ............... 51

*National Management Corporation v. Adolfi,* 727 AD2d 553 [3d Dept 2000] .......... 58

*North Fork Bank v. Computerized Quality Separ,* 62 A.D.3d 973 [2d Dept 2009].................................................................................................................... 45

*Reyes v. Lexington 79th Corp.,* 149 A.D.3d 508 [1st Dept 2017].............................. 57

*Sterling Nat. Bank Trust Co. of N.Y. v. Giannetti*, 53 AD2d 533 [1st Dept 1976]............................................................................................................... 45, 47

*Tinicum Financial Corp. v. Lorch,* 226 AD2d 214 [1st Dept 1996].......................... 58

*Thor Gallery at S. Dekalb, LLC v. Reliance Mediaworks (USA) Inc.,* 143 AD3d 498 [1st Dept 2016]....................................................................................... 54

*Tuebor REIT Sub LLC v. Paul,* 1:19-cv-08540-JPO [SDNY] .................................... 15

*Winegrad v. New York Univ. Med. Ctr.*, 64 NY2d 851 [1985] ................................... 53

*Wehringer v. Helmsley Spear Inc.,* 91 AD2d 585 [1st Dept 1982], *aff'd* 59 NY2d 688 (1983).................................................................................... 53

*Wells Fargo Bank, Nat. Ass'n v. Stargate Films, Inc.,* 18 AD3d 264 [1st Dept 2005].......................................................................................................... 54

*Zonghetti v. Jeromack,* 150 AD2d 561, 563 [2d Dept 1989] ....................... 57

**Statutes:**

11 U.S.C. §362(d)(1) ...................................................................................... 17

CPLR §2201 ........................................................................................... 33, 57

CPLR §3211 ........................................................................................... 33, 34

CPLR §5701(a)................................................................................................. 1

## PRELIMINARY STATEMENT

Defendant-Appellant NATIN PAUL, by his attorneys herein, MCSHAPIRO LAW GROUP, PC and J. SINGER LAW GROUP, PLLC files this brief in support of his appeal pursuant to CPLR §5701(a) from one Decision and Order of the Supreme Court of the State of New York, New York County (BORROK, J.S.C.), dated March 2, 2022 and entered in the Office of the New York County Clerk on March 7, 2022 (the "Omnibus Order") (R.5-12), which identical order was entered on the NYSCEF system three different times, once with respect to each Motion Sequence being decided therein.

Plaintiff's First Amended Complaint seeks the recovery of more than $39,000,000 from Defendant Paul individually (R.51-3) by a lender who, Defendant Paul contends, manufactured a default by the borrowers on the loan in question and engaged in a predatory "loan to own scheme" that resulted in the lender foreclosing on the valuable Austin, Texas commercial real estate properties in question, which were clearly worth more than the total indebtedness. Defendant Paul contends that the lender rejected bankruptcy reorganization plans in which refinancing would have satisfied the entire alleged indebtedness (and all interest, costs and fees), and then seized the properties for shockingly low value credit bids at rigged foreclosure sales (in which Plaintiff ATX Debt Fund 2, LLC ("ATX2")'s agents violated the law and

eliminated any competitive bidding) in order to misappropriate the borrowers' valuable real property while fraudulently manufacturing a deficiency claim against the guarantor, who is the ultimate beneficial owner of the borrower entities. Indeed, one property was taken for a "credit bid" of only $53,000,000 only one month after ATX2's agent voided a competitive bid of $90,500,000 for that same property. The guarantor's defenses are based upon the lender's unclean hands, the predatory "loan to own scheme" perpetrated by both Original Plaintiff Ladder Capital Finance, LLC ("Ladder") and ATX2, which included the fraudulent and oppressive "Rigged Foreclosure Sales" and the filing of deeds of title to those properties (the "Properties"). The defenses also include the fact that actual value of the Properties that were foreclosed and with respect to which ATX2 and its associates have filed deeds (which far exceed the borrowers' alleged outstanding indebtedness and the foreclosures of which would moot all claims against the guarantor).

As detailed in the Proposed Amended Answer and the sworn affidavits submitted by Defendant Paul, the fraudulent "loan to own" scheme was orchestrated to enable ATX2 and its affiliates to fraudulently misappropriate for themselves the borrowers' properties, valued at more than $300,000,000. By disregarding the lawful foreclosure process, ATX2 and its affiliates were able to artificially deflate the sales price of the properties at the foreclosure sales in order to enable them to both take the valuable properties for themselves well below fair market value and to leave a

large, artificial deficiency to pursue against Defendant Paul, the guarantor on the loans.

In deciding the two orders on appeal, the IAS Court again demonstrated its clearly biased view in favor of the commercial lender(s) when it stood fast to its erroneous view that the guaranty executed by the Defendant waived all defenses and counterclaims, and that such a waiver was enforceable with respect to defenses grounded in willful, intentional, fraudulent and oppressive conduct by the lender that post-dated the signing of the guaranty (despite controlling law to the contrary). The IAS Court ignored, without ever addressing, the fact that Section 2.14 of the guaranty specifically carves out a defense by the guarantor for "any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" (R.1333,1581). The defenses enumerated in the Answer (R.147) and Proposed Amended Answer (R.587-606), are clearly grounded in fraud and other willful misconduct on the part of the lender (ATX2) and its agents, which happen to be the same misconduct raised by the borrowers in the "Wrongful Foreclosure Proceeding" pending in Texas (R.321-473). These are legitimate defenses that the New York Courts have held to be unwaivable by a guarantor, particularly where the fraud by the lender takes place after the unconditional guaranty containing the waiver has been signed. The IAS Court failed to address, let alone distinguish, the

controlling case law cited by Defendant Paul regarding the unenforceability of waivers with respect to such defenses or claims.

The IAS Court "declined to sign" or even consider Defendant Paul's application to stay the case pending this Honorable Appellate Court's determination of Appeal No. 2022-0108 that was then scheduled to be heard in the May Term ("Appeal 1") (or the Wrongful Foreclosure Proceeding in Texas) (R.488-89). Motion009 detailed how the core issues to be decided on Appeal1 would also be determinative of the additional motions due to be argued and decided in the case (R.66). After refusing to hear Motion009 to stay the proceedings, the IAS Court first adjourned and then canceled the oral argument of Motions003,005&008, even after acknowledging the prior evening that Plaintiff's summary judgment motion was seemingly deficient (and where Defendant Paul had requested and expected oral argument to be held to address that point and complete the record). While the handwritten "decline to sign" notation on the proposed order to show cause may not be an appealable order, Defendant Paul maintains that the refusal to sign that OSC and then issuing the Omnibus Order without oral argument constituted an abuse of discretion by the IAS Court that this Honorable Court should consider when reviewing the IAS Court's rush to judgment against the defendant guarantor.

The portion of the Omnibus Order denying the motion to strike the note of issue (Motion008) were also based on the IAS Court's erroneous view that no

defenses were available to the guarantor, and thus no discovery could be material or necessary. Notably, one of the issues on which Defendant Paul sought discovery was Plaintiff ATX2's unclean hands and its standing as a holder in due course of the loan documents necessary to maintain the claims against the guarantor.

The portion of the Omnibus Order dismissing the affirmative defenses (Motion003) contains clear errors of both law and fact. It quotes but does analyze at all, the various clauses of the guaranty (R.5-12), including Section 2.14 – the key clause which actually preserved defenses "constituting any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" (R.9,2387,2635). The order also mistakenly states that the alleged fraud was directed at the borrowers, not the guarantor (R.11). This ignores the actual facts, that the guarantor is the ultimate beneficial owner of the borrowers (and thus the properties) and the defenses and proposed counterclaim clearly state that the "loan to own scheme" included the fraudulent manufacturing of a deficiency to support claims against the guarantor in order to pressure the borrowers and guarantor to end the Wrongful Foreclosure Proceeding and walk away from the tens (if not hundreds) of millions of dollars of equity in the properties (R.587-606). The IAS Court also misreads the proposed amended affirmative defenses when it erroneously concludes that "the proffered amendments that the Guarantor proposes fail to establish, even if true, that the Original Lender or the Lender fraudulently induced the Guarantor to

sign the Guaranties or fraudulently seek to collect their debt under the terms of the Guaranties" (R.11). Indeed, that is exactly what the proposed affirmative defenses and counterclaims state, that the entire fraudulent "loan to own scheme" by the "predatory lender" was premised and dependent upon the use of a false, manufactured deficiency against the guarantor to claim in this very action (R.603-06). The Omnibus Order also fails to address the argument that, even if there was a waiver of such defenses and claims, the waiver of fraud claims would be unenforceable as a matter of law.

The portion of the Omnibus Order deciding Motion005 and granting ATX2 summary judgment simply stated that a prima facie case had been established and that "the Guarantor has failed to raise any material issues of fact in its opposition papers" (R.6), and did not at all address the Defendant Paul's argument that the discovery previously denied in the orders subject to Appeal1 was material and necessary to disputed issues regarding the establishment of the prima facie case and the various defenses. The sole factual affidavit submitted in support of summary judgment was by Liz Boydston, an outside lawyer who had represented the Original Plaintiff Ladder and Plaintiff ATX2 in opposing the bankruptcy reorganization plans and who, according to Defendant Paul, misrepresented the value of the properties to the bankruptcy court, personally directed the rigged foreclosure sales and assisted in eliminating competitive bidding, represents ATX2 and its affiliates in the Wrongful

Foreclosure Proceeding in Texas State Court, and who refused to accept service of a subpoena to testify regarding the allegations of her affidavits. The IAS Court failed to address the lack of sufficiency of the Boydston affidavit – despite the law secretary having sent an email to ATX2's counsel after 10 p.m. on the night before the scheduled oral argument noting that there was no factual affidavit by a lender representative, and receiving the misleading and conclusory email back from ATX2's counsel representing that the Boydston affidavit was based on "personal knowledge" (R.3037-38). Further demonstrating the IAS Court's biased view regarding commercial lenders, the Omnibus Order directed ATX2 to submit a judgment (R.12), despite the fact that ATX2's motion clearly stated that the motion sought summary judgment on liability only, and that a trial would be required to determine the amount of any damages to be awarded to ATX2 in the form of a judgment (R.2758,2893,2904).

On Appeal1, Defendant Paul presented how the IAS Court's erroneous and limited view of the availability of defenses to the guarantor erroneously denied him the opportunity to take any discovery related to the claims and the defenses, including Plaintiff ATX2's lack of good faith and fair dealing with respect to the underlying loan, Plaintiff ATX2's fraudulent manufacturing of a false deficiency to enforce against both the borrowers and the guarantor, and the fact that there are no outstanding obligations or indebtedness left to be enforced against the Guarantor if

the Plaintiff foreclosed and took title to the Properties that were worth far more than any outstanding indebtedness or claims against the Guarantor (R.69-125). On Appeal1, Defendant Paul argued that the IAS Court erred by denying Motions006&007, and effectively denying Defendant Paul any discovery from Plaintiff ATX2, its "non-party" agents and affiliates (including its sole affiant in support of its pending motions seeking to strike the affirmative defenses and for summary judgment, and the "Substitute Trustees" who ran the Rigged Foreclosure Sales) and Original Plaintiff Ladder Capital (and its executives, if necessary) (*Id.*).

On the instant appeal of the remaining orders rendered by IAS Court, Defendant Paul respectfully submits that the IAS Court abused its discretion in "declin[ing] to sign" (R.488-9) the order to show cause and properly consider the application to the stay the proceedings and not decide Motions003,005&008 until this Court considered the overlapping core issue presented on Appeal1, and in abruptly canceling the oral argument of those three motions. Defendant Paul also respectfully submits that the IAS erred in deciding all of those motions in favor of Plaintiff ATX2, for the reasons summarized above. Accordingly, Defendant Paul respectfully requests that this Honorable Court reverse the Omnibus Order in its entirety, on Motion003 deny Plaintiff ATX2's motion to strike the affirmative defenses and grant Defendant Paul's cross-motion to file the Proposed Amended Answer (with affirmative defenses and counterclaims), on Motion005, deny Plaintiff

ATX2's motion for summary judgment, on Motion008 grant Defendant Pauls' motion to strike the note of issue and certificate of readiness on the grounds that the discovery sought by Defendant Paul (and any appropriate follow-up discovery) is material and necessary to the claims and defenses, and on find that the IAS Court abused its discretion in refusing to consider (let alone grant) Motion009 and instead plowing ahead with a rush to judgment against the guarantor, and issue an order staying this case until the conclusion of the Wrongful Foreclosure Proceeding in Texas state court, and order that, upon lifting of the stay (or remand), the action and all subsequent proceedings shall be reassigned to another justice of the Commercial Division.

## **QUESTIONS PRESENTED**

**Question 1:**     Did the lower court commit reversible error when it granted Plaintiff ATX2's motion to strike the defendant Guarantor's affirmative defenses and denied the cross motion to file the Proposed Amended Answer (Motion003)?

**Short Answer:**     Yes. The lower court committed reversible error when it dismissed the affirmative defenses based upon the IAS Court's erroneous conclusion that the Guaranty waived all defenses and that such a waiver was enforceable with respect to the defenses articulated by the Defendant Guarantor, which were clearly grounded in intentional, fraudulent, oppressive and willful misconduct by the lender that occurred after the Guaranty had been signed.

**Question 2:**     Did the lower court commit reversible error when it found that Plaintiff ATX2 had established a prima facie case in support of its motion for summary judgment (Motion005)?

**Short Answer:**     Yes. The lower court committed reversible error when it found that ATX2 was a holder in due course with standing to enforce the loan documents and guaranty and that the affidavit of the lender's outside lawyer was of sufficient evidentiary proof to establish a prima facie case, particularly when Defendant Paul had been denied the right to take discovery on those issues.

**Question 3:**        Did the lower court commit reversible error when it granted summary judgment to ATX2 as the lender in light of the discovery that Defendant Paul sought to take which is material and necessary to the claims and defenses, including ATX2's unclean hands and lack of standing to bring the claim, and ATX2 own fraudulent, intentional and willful misconduct aimed at the guarantor?

**Short Answer:**       Yes. The lower court committed reversible error when it ruled that the Guaranty waived all defenses and that such a waiver was enforceable with respect to the defenses articulated by the Defendant Guarantor, which were clearly grounded in intentional, fraudulent, oppressive and willful misconduct by the lender that occurred after the Guaranty had been signed, which defenses would have defeated summary judgment and which discovery would have confirmed that ATX2 had foreclosed on and filed deeds with respect to the underlying commercial real estate properties and that those properties were worth far more than any indebtedness owed (thus mooting out any claims against the Guarantor).

**Question 4:**        Did the lower court abuse its discretion when it instructed Plaintiff ATX2 to submit a proposed judgment, when Plaintiff ATX2's own summary judgment motion conceded that it only sought an order on liability, and that a trial would be required to determine the amount of any damages to be awarded to ATX2 in the form of a judgment?

**Short Answer:**    Yes. The lower court committed reversible error when it instructed the lender Plaintiff ATX2 to submit a proposed judgment instead of scheduling a trial or evidentiary hearing to determine the fair market value of the underlying commercial real estate properties on which ATX2 had previously foreclosed on and filed deeds with respect to, which trial or evidentiary hearing would confirm that the properties were worth far more than any indebtedness owed (thus mooting out any claims against the Guarantor).

**Question 5:**    Did the lower court commit reversible error when it denied the relief sought in Motion008 (seeking to strike the note of issue and certificate of readiness based on the need to conduct material and necessary discovery), and effectively denied Defendant any discovery of non-parties, including the original lender (and original plaintiff) Ladder Capital, and the associates and affiliates of Plaintiff ATX2 (including the outside lawyer who was its sole affiant in support of its then-pending motions seeking to strike the affirmative defenses and for summary judgment, and the "Substitute Trustees" who ran the "Rigged Foreclosure Sales" for ATX2)?

**Short Answer:**    Yes. For the reasons articulated in support of Appeal1 (of the Discovery Denial Order), and reiterated in Motion008, the lower court committed reversible error when it concluded that none of the discovery sought was relevant, based on the IAS Court's mistaken view that the guaranty's "no offset"

provision effectively waived or rendered all of the guarantor's defenses irrelevant to the case.

**Question 6:**        Did the lower court abuse its discretion when it "decline[d] to sign" the order to show cause submitted by the Defendant Guarantor as Motion009 (and refused to consider the application to stay the proceedings pending the decision on Appeal1 and the Wrongful Foreclosure Proceedings in Texas) and then canceled oral argument of Motions003,005&008 after emailing Plaintiff ATX2's counsel the previous night to note a deficiency in the motion for summary judgment and then summarily ruled on the papers in favor of Plaintiff ATX2 on all three motions in the Omnibus Order?

**Short Answer:**        Yes. The lower court abused its discretion and should have (a) at least considered stayed the proceedings pending a determination of the core issue regarding the scope of the waiver and the availability of the defenses as a matter of law by this Honorable Appellate Court on pending Appeal1, and (b) not issued the Omnibus Order in ATX2's favor without permitting Defendant Paul the opportunity to address at oral argument the IAS Court's articulated concern that ATX2 had failed to submit a probative affidavit of a lender representative on its summary judgment motion, and the other issues raised by ATX2 on its reply papers submitted on Motions003& 005 and in its opposition papers submitted on Motion008.

## THE UNDERLYING CONTROVERSY AND THE DECISION BELOW

### I.    Relationship of the Parties and the Loan Documents and "Defaults"

As detailed in both the Proposed Amended Answer (R.587-606) and the Affidavit of Natin Paul submitted in opposition to summary judgment (R.2865-2885), companies ultimately owned or managed by Defendant Paul (the "Borrowers")[1] acquired a number of real estate properties (the "Properties") located in and around Austin, Texas, in separate, open market transactions around May 2018 to July 2018 (R.589-20,2865-66). The Borrowers paid approximately $8 million in cash equity of the combined purchase price for the Properties upon acquisition and financed the remaining amounts with Ladder under a loan in the original principal amount of $18,455,000.00, which was then increased to $47,614,000 (R.1018,2865-86). To secure payment, the Borrowers made, executed, and delivered in favor of Ladder as series of loan documents, including the guaranties of the loan and a guaranty for each lease that were simultaneously signed by Defendant Paul (the "Loan Documents") (R.992-93). Ladder apparently transferred all of its right, title and interest in the loan and Loan Documents, including the guarantees Defendant

---

[1]    The Borrowers were WC Hirshfeld Moore, LLC ("WC HirshfeldMoore"), WC 805-809 East Sixth, LLC ("WC 805-809 East Sixth"), WC 320 Congress, LLC("WC320 Congress"), WC 901 EAST CESAR CHAVEZ, LLC ("WC 901 East Cesar Chavez"), WC 1910 WEST BRAKER, LLC ("WC 1910 West Braker"), WC 1212 EAST SIXTH, LLC ("WC 1212 East Sixth"), WC 9005 MOUNTAIN RIDGE, LLC ("WC 0995 Mountain Ride"), WC 103EAST FIFTH, LLC ("WC 103 East Fifth") AND WC 422 CONGRESS, LLC ("WC 422Congress"). The Property located at 1910 Braker and owned by WC1910 West Braker was released from the Loan (R.591).

had provided in connection with the loan, to ATX2 in or about December 2020, which assignment led to ATX2 being substituted in as Plaintiff in this action (R. 152,587).

Earlier in 2018, Ladder had made a loan to Silicon Hills Campus, LLC - another company for which Defendant Paul executed guaranties. That loan is secured by, among other collateral, a 158 plus acre property containing 1.3 million square feet of improvements and an attendant power plant (the "Silicon Hills Property") (R.2866-67). Ladder apparently transferred all of its right, title and interest in the Silicon Hills Loan and loan documents to Tuebor REIT Sub LLC as the Lender, and then Tuebor apparently transferred all of its right, title and interest in the Silicon Hills Loan and loan documents, including the guaranty that Defendant provided in connection with the loan, to ATX2's corporate affiliate, ATX Debt Fund 1, LLC ("ATX1") in or about December 2020 (*Id.*). That assignment led to ATX1 being substituted in as Plaintiff in a similar action pending against Defendant as the Guarantor of the Silicon Hills Loan in the federal district court for the Southern District of New York, styled as *Tuebor REIT Sub LLC v. Paul,* 1:19-cv-08540-JPO (the "SDNY Action") (*Id.*).

In August 2019, Ladder and the Silicon Hills borrower engaged in negotiations and ultimately agreed upon a loan extension of the Silicon Hills loan (R.2867). During these negotiations, the parties exchanged various terms and

requirements which resulted in an agreement that Silicon Hills would be required to meet certain requirements prior to August 30, 2019, including the payment of $2,592,954.00 for various purposes, including loan pay-down, taxes, debt service, and extension fee, among other items – those agreements were ultimately memorialized in a third amendment to the underlying loan agreement (*Id.*). On August 29, 2019 at 9:48 p.m., Ladder sent Silicon Hills an acknowledgement that it had submitted its signatures agreeing to the extension to be held in escrow. On August 30, 2019 at 5:55 a.m., Ladder sent to Silicon Hills an e-mail acknowledging its receipt of the fully executed extension documents by Silicon Hills. After the third amendment had been finalized and signatures placed in escrow, at the 11th hour, Ladder insisted that Silicon Hills borrower pay $3,217,153.00, or over $700,000 in additional funds, refusing to honor the agreement reached by the parties. Ladder then erroneously claimed the Silicon Hills Loan to be in maturity default as of 1:00 p.m. on August 30, 2019, despite the agreement being signed and escrowed. Ladder then abruptly discontinued all communication with Silicon Hills and  marched to the courthouse with a pre-prepared *ex parte* Emergency Application for the Appointment of a Receiver over the Silicon Hills Property and sought to place the property in receivership. State court litigation ensued, which ultimately resulted in the filing of a bankruptcy petition by the Silicon Hills Borrower seeking a reorganization (R.2867-68).

Almost simultaneously after declaring Silicon Hills in default and forcing a bankruptcy filing by the Silicon Hills Borrower, Ladder filed a notice of default and notices of foreclosure with respect to the Properties owned by the Borrowers that are the subject to the instant action (R.2868). On or about January 7, 2020, after one late payment by the Borrowers, Ladder accelerated all obligations and immediately pursued foreclosures of the Properties. Each of the Borrowers then filed bankruptcy petitions that were consolidated into one proceeding in Texas bankruptcy court seeking reorganizations. Ladder filed and pursued a Motion for Relief from the Automatic Stay for Cause Under 11 U.S.C. §362(d)(1) with Respect to Non-Residential Real Property (R.2868-69).

## II.    Ladder/ATX Fraudulently Misrepresent that the Properties are Undersecured to Pave the Way to Rigged Foreclosure Sales

Ladder vehemently took the position in the bankruptcy court proceedings that they were undersecured in the underlying loans on the Properties, while at the same time their CEO and other executives represented to investors in their public earnings reports and public earnings calls that Ladder was vastly oversecured (R.2869). For example, on a February 27, 2020 earnings call, CEO Brian Harris was asked how confident he was that he could recover his basis and any accrued interest on the Silicon Hills loan, to which he replied, "we're very confident . . . [it] will be a pretty big windfall if we collect all that interest" (R. 2869-70).

Additionally, in urging the bankruptcy court to grant it relief from the automatic stay so that Ladder (or its successors ATX1 and ATX2 (collectively, "ATX") could proceed with foreclosure, Rob Perelman of Ladder testified that Ladder had not taken any impairment or write-down on the Silicon Hills Loan (R.2870). Ladder's statements to the Bankruptcy Court that the Silicon Hills Property and the Properties were worth less than the amount outstanding on the loans were entirely contrary to its representations made regarding the value of the loans and underlying collateral in its public earnings calls, as well as contradictory to the amount for which it subsequently sold the notes to ATX (R.2870-71).

According to the transcript of a February 26, 2021 earnings calls, Ladder executives stated that "Ladder reduced its balance of non-accrual loans by 35%, mainly by selling forward defaulted loans at near par value. We sold two defaulted loans in bankruptcy in Austin, Texas, with an outstanding principal balance of $101 million" and clarified that "we sold some non-performing loans this quarter and got almost par for all of them" and stated that "we've been able to sell defaulted loans, bankrupt loans, and all of them with a 98-ish type number, you know, across the board" (R.2870).

In other words, Ladder, a public company, in order to persuade the Texas Bankruptcy Court to lift the automatic stay and allow non-judicial foreclosure sales of the properties to proceed, falsely represented to the bankruptcy court that it was

vastly undersecured in the loans, and that that the underlying properties lacked equity (R.2870-71). At the same time, it publicly reported that the loans were oversecured and it negotiated a loan sale to ATX that allowed nearly a total recovery on the loans (R.2870-71). In or around December 2020, Ladder then filed Transfers of Claim Other Than for Security in which it reflected transfers of its claims to ATX1 and ATX2 for the underlying loans (R.2871).

ATX apparently organized itself to intentionally obfuscate the identify of its principals and beneficial owners, and then vehemently fought any such disclosure in the bankruptcy court proceedings (R.2871-72). When the Borrowers urged that ATX's identify information be disclosed so that the Borrowers could determine if ATX had any previous relationship with the Borrowers, ATX refused (*Id.*). At one point during the bankruptcy proceedings, the Borrowers and ATX2 had actually agreed to a settlement of the dispute over the motion for relief from stay for the Borrowers but ATX2 reneged on its agreement in principle when the Borrowers would not acquiesce to ATX2's late hour demand that the Borrowers and Silicon Hills would need to stop pursuing discovery regarding the identity of the real owners, managers, members or control persons of ATX in the Silicon Hills bankruptcy proceedings (R.2872).

The actual owners, members, managers and controlling persons of Plaintiff ATX2 (and ATX1) have insisted on their anonymity since the purchase of the

Loans, resisting discovery as to their identity, without explanation (R.761,3926). To further obfuscate the beneficial owners, ATX even had their lawyers hire a "front man" named Navid Moshtaghi to act as the only businessperson disclosed to the Borrowers or Silicon Hills (or their counsel) since the acquisition of the loans by ATX (*Id.*).

The "straw man" nature of Moshtaghi's agency became clear in testimony he provided with respect to the disputes (*Id.*). Despite having been offered as the only disclosed businessperson associated with ATX2, Moshtaghi testified under oath as the designated representative of ATX in the bankruptcy proceedings that he knew practically nothing about the Loans or the Properties (*Id.*). He specifically stated that he wasn't "clear on who the principals [of ATX1] are," did not know how much debt was held under the Note[s], and had no information at all with regard to the ATX entities or the Properties themselves" (R.2872-73).

In fact, the only thing Moshtaghi testified that he knew about the ATX2 loan at all was "that there are guarantees outstanding and that's a big part of the claim" (R.2873). This admission was made before the automatic stay was lifted, and before any foreclosure sales were noticed, but indicated that Moshtaghi was aware that ATX2 became involved with the loans with a pre-mediated plan to manufacture deficiencies and pursue claims against the Guarantor to pressure the borrowers and the guarantor, who is the ultimate beneficial owner of the borrowers and the

properties (*Id.*).

### III.   ATX's May 2021 Foreclosure Attempt and the $90,500,000 Voided Sale of Silicon Hills Property.

In April 2021, ATX1 issued a notice of foreclosure sale of the Silicon Hills Property to be held on May 4, 2021. Prior to the foreclosure sale, the Silicon Hills borrower presented a motion to the bankruptcy court to approve $85 million in financing that would have repaid ATX1 *in full* on its approximately $78 million of claimed outstanding indebtedness on that loan. ATX1 opposed the motion, and insisted that it proceed with the May 4 foreclosure auction (R.2874).

At the May 4 auction, competitive bidding took place, with ATX1 bidding against a third-party bidder. The bidding on the Silicon Hills Property reached $90,500,000, with the third-party bidder being the high bidder and the ATX1 being the second highest bidder, with a bid of $90,000,000 (which consisted of both a credit bid and additional cash of over $10 million above the outstanding debt ATX1 claimed to be due and owing under the Silicon Hills Note) (*Id.*).  It became clear at this auction that the reason ATX1 had opposed a payoff in full of its note is that it desired to take the Silicon Hills Property for itself.  Ultimately, the third party bidder outbid ATX1, but then the Substitute Trustee designated by ATX1 mandated the onerous and unusual requirement that the third-party bidder tender the sale proceeds via cashier's check in the amount of $90,500,000 payable to ATX1, rather than by

21

wire transfer (as is the usual procedure for foreclosure sales in Travis County of this size), and required that such cashier's check must be delivered by 3:45 p.m. on May 4, 2021, approximately one hour after the bidding had concluded (*Id.*).

The third-party bidder's representative arrived back at the Courthouse to consummate the sale at approximately 3:50 p.m. on May 4, 2020, but the Substitute Trustee had already recommenced a new auction without any other notice to the third-party bidder (*Id.*). However, since bidding at the recommenced sale continued past 4:00 p.m., and the Texas Property Code requires sales to be completed by 4:00 p.m., the Substitute Trustee announced that the May foreclosure sale was adjourned and that foreclosure of the Silicon Hills Property would need to be re-noticed for June 1, 2021 (*Id.*).

## IV.    ATX's Attempts To Take Title to the Silicon Hills Property and The <u>Properties Through Rigged Foreclosure Sales in June 2021.</u>

Having been unsuccessful in acquiring the Silicon Hills property for itself in May 2021, ATX then undertook the last portion of its "loan to own scheme" to ensure it would come to own the properties it desired at the June 2021 foreclosure auction (R.2875).

To effectuate the scheme, on May 10, 2021, ATX1 first filed in the Travis County real property records a Notice of Appointment of Substitute Trustee, in which it purported to replace the named trustee under the Deed of Trust for the

Silicon Hills Property with nine substitute trustees including two new trustees, Chris Neilson and David Tomek (*Id.*). On May 10, 2021, ATX2 similarly filed in the Travis County real property records 8 separate Notices of Appointment of Substitute Trustee for The Properties, in which ATX2 purported to replace the named trustee under the Deeds of Trust with nine substitute trustees including Chris Neilson and David Tomek (*Id.*).

On May 11, 2021, ATX1 then re-noticed a foreclosure sale of the Silicon Hills Property to be held on June 1, 2021 and Plaintiff ATX2 noticed foreclosure sales of each of the Properties to also be held on June 1, 2021 (*Id.)*. However, the foreclosure notices for the Properties and the Silicon Hills Property ("June Foreclosure Notices") contained significant errors that rendered the notices void (*Id.*). Prior to the foreclosure sales, counsel for the Borrowers informed ATX1, ATX2, and the substitute trustees David Tomek and Chris Neilson, ("Primary Substitute Trustees") of the defects and irregularities of the June Foreclosure Notices prior to the date and time of the sale (*Id*). ATX1, ATX2, and the substitute trustees David Tomek and Chris Neilson did not respond to the notices sent by counsel and instead ignored the defects and irregularities of the June Foreclosure Notices – which were non-compliant with Texas Law (R.2874-75). They did not cancel the sales in order to rectify the defects and irregularities as required by law, and instead insisted on proceeding with the foreclosure sales in spite of their

invalidity. ATX1 and ATX2 clearly filed the May 11 trustee appointments naming 9 different Substitute Trustees for the Properties and the Silicon Hills Property in order to unnecessarily create confusion for prospective bidders at the foreclosure sale and to assist in their fraud while intending to only utilize the two newly added Primary Substitute Trustees rather than the other 7 Substitute Trustees who work for a professional company that regularly conducts foreclosure auctions in Travis County (R.2876).

Defendant, along with representatives of the Borrowers and Silicon Hills, arrived at the site of the foreclosure sales prior to the noticed time of sale on June 1, 2021, along with several interested bidders who were prepared to bid on the Silicon Hills Property and The Properties with cash in hand (*Id.*). The site of the foreclosure sale was swarming with over 50 loud protesters rendering the site chaotic and making it nearly impossible to hear any announcements regarding the foreclosure sales (*Id.*). Discovery served on ATX and its affiliates sought to determine whether the protests were staged by ATX as part of their fraudulent, oppressive and willful misconduct (RI.209).

Prior to the time set for the foreclosure sales to commence, Defendant Paul saw the Co-Founder of Karlin, Matthew Schwab, in attendance at the foreclosure sales. Schwab then confirmed in a conversation with Paul and others that that Karlin and Schwab were the controlling persons or owners of ATX (R.3930). Schwab

confirmed that he knew that counsel for the Borrowers had noticed ATX of the defects in the foreclosure notices, and informed Paul, in sum or substance, that "I am aware …but we are proceeding anyway" (R.2876).

Defendant Paul asked Schwab which substitute trustee would be conducting sales and how bidders could register to bid, and Schwab coyly responded, "I have no idea" (*Id.*). Conducting any foreclosure sales in the bedlam of the protests, when no one could hear any trustees announcing any particular foreclosure sales, created a situation where there was no real public auction -- ready, willing and able bidders were unable to, or were outrighted excluded from, participating (*Id.*). Schwab even went so far as to outright declare that he knew that after the foreclosure sales that Karlin and its associates would own the Properties and the Silicon Hills Property, stating in sum or in substance, that the defects in the foreclosure sale notices "sound like good claims to raise in litigation; we are going to get these properties today and there is going to be a deficiency, so I'm sure that you will raise that in court" (*Id.*). In other words, Schwab had prior knowledge of what the results of the auction would be – that ATX1 and ATX2 would win the auctions, purchase the properties at a steep discount to market value in a rigged bidding scheme, and manufacture a deficiency under the loan for which they intended to sue Defendant Paul as a guarantor (R.2876-77).

As the foreclosure sales nonetheless proceeded, the Primary Substitute

Trustees, acting on behalf of ATX, imposed unreasonable, onerous, irregular and oppressive conditions on the foreclosure sale designed to exclude the ready, willing and able third-party bidders from the auctions so that competitive bidding would not occur (as it did at the May auction), thereby depressing the sale prices of the properties, and so that ATX1 and ATX2 could achieve its pre- meditated result – to be deeded the properties for grossly inadequate prices and manufacture deficiencies under the guaranty (R.2877). The irregular and oppressive conditions included refusing to let any party bid at the foreclosure sale that did not have a pre-prepared cashier's check payable specifically to the Plaintiff or in the name of the particular Substitute Trustee conducting the sale (even though there were 9 different Substitute Trustees listed for the sale of each of the Properties and the Silicon Hills Property) (*Id.*).

The foregoing condition is not the standard or typical practice for foreclosure sales in Texas, and is a condition Defendant has never seen imposed in having personally witnessed over 1,000 foreclosure auctions in Travis County over the last 15 years (*Id.*). The substitute trustees who conducted the sales refused to allow any bidder to bid that did not meet this arbitrary requirement which runs contrary to the requirements of foreclosure sales under Texas law and under the Deeds of Trust (*Id.*). Additionally, the Primary Substitute Trustees refused to speak with Defendant and specifically refused to allow Defendant or any of Defendant's

affiliates to bid on any of the properties (*Id.*). After excluding Defendant and other bidders, and over their objections, the Primary Substitute Trustees even went so far as to conduct several of the auctions speaking quietly behind a binder so that the public could not hear or know that an auction was being conducted at all (*Id.*).

The Proposed Amended Answer and Paul Affidavit both allege that ready, willing and able interested purchasers were intentionally prohibited from bidding at the foreclosure sales, resulting in no competitive bidding, and allowing ATX1 and ATX2 to achieve grossly inadequate, below market sales prices of Defendant's Properties so that ATX could manufacture guaranty claims against Defendant Paul (R.2878). For example, ATX1 claims that it successfully won the Silicon Hills Property at the June auction with only a mere $53,000,000 credit bid, a price that was $37,500,000 less than the high bidder at the canceled May foreclosure sale, $37,000,000 (THIRTY SEVEN MILLION DOLLARS) less than ATX1 itself had actually bid itself at the canceled May foreclosure sale, nearly $26,000,000 less than what ATX1 claims was outstanding debt due and owing on the Silicon Hills Property (including default interest and fees), approximately only half of the $101,254,533 Travis County Appraisal District tax value of the property, and nearly $200,000,000 (TWO HUNDRED MILLION DOLLARS) less than a recent appraisal of the property (R.2878-79).

As ATX1's Primary Substitute Trustees did in the Silicon Hills Property sham foreclosure sale, the Primary Substitute Trustee acting on behalf of the ATX2, imposed the same onerous and oppressive conditions on the foreclosure sales of the Properties which were not reasonable (R.2879). As a result, several interested, ready, willing and able buyers were turned away from the foreclosure sales of the Borrowers' properties, negating any competitive bidding, and rendering ATX2 the only bidder at several sales (*Id.*). Defendant Paul believes that ATX2 had agreed on this requirement with the Substitute Trustee, and did not disclose the bidding requirements to any other party except for Congress Avenue Holdings, LLC and other entities associated with Pennybacker Capital, LLC ("Pennybacker"), with whom Karlin or its affiliates have a previous relationship (R.2879-80). Once again, this was part and parcel of the overall scheme to take the Properties for themselves and engineer a fraudulent deficiency claim against Defendant (R.2880). The comments made by Moshtaghi and Schwab of ATX ahead of the alleged sales, indicating the ATX would be looking to collect on the guarantees and that there would be a deficiency after the sales concluded, evidenced that ATX knew what the outcome of the rigged foreclosure auctions would be and that this wholly improper result was intentional, pre-meditated, in bad faith, fraudulent and oppressive (R.2879).

Following the wholly improper and rigged foreclosure auction, on June 2,

2021, the Substitute Trustee then filed and recorded Substitute Trustee's Deeds for the Silicon Hills Property and the Properties in the Public Records of Travis County, Texas (R.2880). The Substitute Trustee's Deed indicates that the Silicon Hills auction was completed by 10:05 a.m. – only 5 minutes after the foreclosure sales were allowed to commence by statute (*Id.*). As it would have been nearly impossible to complete all of the prerequisite announcement to opening bidding and complete a sale within 5 minutes, this scenario is entirely unlikely unless there had been cooperation and planning among ATX1 and the Substitute Trustee prior to the foreclosure sale (*Id.*).

According to the deeds filed in the local real property records, the results of the "Rigged Foreclosure Sales" for the Properties were as follows:

a.   10:14 a.m.: 805 E. Sixth St. and 809 E. Sixth St. were purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $1 million. The Substitute Trustee excluded all bidders other than ATX 2. The appraisal district valued the properties at about $2.45 million.

b.   10:21 a.m.: 9005 Mountain Ridge Drive was sold to ATX Debt Fund 2, LLC for a credit bid of $1.5 million. The Substitute Trustee excluded all bidders other than ATX 2. The building was valued at nearly $6 million by the appraisal district.

c.   10:29 a.m.: 901 East Cesar Chavez was purportedly sold to ATX Debt

Fund 2, LLC  for a credit bid of $1.5 million. The Substitute Trustee excluded all bidders other than ATX 2. The property is valued at $4.24 million by the appraisal district.

       d.     10:37 a.m.: 305-309 West 9th was purportedly sold for $5.7 million to Pennybacker. The Substitute Trustee excluded all bidders other than ATX 2 and Pennybacker.

       e.     10:49 a.m.: 103 E. Fifth St. was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $5,000,000. The Substitute Trustee excluded all bidders other than ATX 2. The property is valued at $6.56 million by the Travis Central Appraisal District.

       f.     10:58 a.m.: 320 Congress Avenue was purportedly sold to ATX Debt Fund 2, LLC  for a credit bid of $13,200,000. The Substitute Trustee excluded all bidders other than ATX 2 and Pennybacker.

       g.     11:33 a.m. 1212 East Sixth St. was purportedly sold for $5.9 million to Pennybacker. The Substitute Trustee excluded all bidders other than ATX Debt Fund and Pennybacker.

       h.     11:54 a.m.: 422 Congress Avenue was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $10,000,000. The Substitute Trustee excluded all bidders other than ATX 2 and Pennybacker (R.2880-81).

      Defendant was present at the foreclosure sale during this time period and

could not hear even ONE of the purported sales for the Silicon Hills property or The Properties being announced (R.2882). Defendant attempted on multiple instances to speak with the substitute trustees to find out information on the bidding procedures and on which properties they were attempting to auction (*Id.*). The substitute trustees refused to ever speak to Defendant (*Id.*). Defendant also personally witnessed other bidders who inquired about how to participate in the foreclosure sales be inexplicably excluded and turned away from bidding (*Id.*). Together, the price that ATX 2 supposedly paid for the Properties (not including the Silicon Hills Property), was $43.8 Million (*Id.*). This total is grossly inadequate in comparison to the market value of the Properties, which was at least $67.88 Million (*Id.*). Most importantly, the prices "paid" by ATX2 and Pennybacker were purportedly less than the total amount allegedly due and owing by the borrowers under the loans (*Id.*). Once again, this was part and parcel of the overall scheme to take the Properties for themselves and engineer a fraudulent deficiency claim against the Defendant Guarantor (*Id.*). The comments made by Moshtaghi and Schwab of ATX ahead of the alleged sales, indicating the ATX would be looking to collect on the guarantees and that there would be a deficiency after the sales concluded, evidenced that ATX knew what the outcome of the rigged foreclosure auctions would be and that this wholly improper result was intentional, pre-meditated, in bad faith, fraudulent and oppressive. In the Proposed Amended Answer (and in the affidavit submitted in opposition to summary

judgment), Defendant Paul detailed all of the foregoing and concludes that the Rigged Foreclosure Sales of the Properties that were held on June 1, 2021 were improper, illegal, and rigged sales that were part of a fraudulent "loan to own scheme" by ATX1 and ATX2, were designed to result in the ownership of highly desirable and valuable downtown Austin, Texas property by ATX1 and ATX2, along with a false and manufactured a deficiency claim against the Guarantor (R.604,2882-83).

## V.   <u>**Procedural History of the Action**</u>.

The original plaintiff, Ladder, initiated this action by filing the summons and complaint and then a "First Amended Complaint", which was dated and filed on February 5, 2020 and is the operative complaint (R.126-41,990-1006) (the "Complaint" or the "NY Compl."). The Complaint annexed hundreds pages of documents as Exhibits (R. 1007-1900), including the "Second And Restated Loan Agreement" and its Schedule I (R.1008), the "Second Amended and Restated Promissory Note" (R.2338-45), the "Guaranty of Recourse Obligations" (R.1414-33), the "Guaranty of Payment, 422 Congress" (R.1876-91), a similar guaranty for each of the Properties, and a "Rent Acceleration Letter" (R.1894-1900).

By order dated February 1, 2021, the IAS Court denied Defendant's motion to either dismiss the Complaint pursuant to CPLR §3211 or stay this action pursuant to CPLR §2201 (based on the prior, ongoing proceedings in Texas regarding

Ladder's assertion of rights as the lender to declare a default and foreclose on the real properties in question in order to satisfy the full obligations due under the Loan Documents) (R.142-45). Federal District Court Judge Oetken, on the other hand, had chosen to exercise his discretion to stay the related SDNY Action based on the rarely used *Colorado River Abstention Doctrine*, avoiding potentially inconsistent adjudications, vexatious litigation and to preserve judicial resources (R.628-41).

On March 11, 2021, Plaintiff ATX2's perfunctory motion to substitute as Plaintiff herein was granted (NYSCEF 95) (R.152,587).

On March 25, 2021, the IAS Court entered a scheduling order that contemplated simultaneous exchange of documents requests and interrogatories, and then responses by both parties, with the end of fact discovery to take place on October 15, 2021 (R-II.821). (References to R-I and R-II are to Volumes I and II, respectively of the Record submitted with Appeal1, which appeal Defendant-Appellant has asked to be considered at the same time as this appeal.)

Defendant then filed an Answer with Affirmative Defenses (R.1902-05). The enumerated affirmative defenses were lack of jurisdiction, Plaintiff's failure to mitigate damages (by rejecting a settlement with the Borrowers that would have satisfied the Indebtedness in full in the form of a refinance by a new lender or the provision of deeds-in-lieu of the real properties in question), accord and satisfaction (by foreclosing on the Properties which were worth more than the Indebtedness),

unclean hands (including Plaintiff's misrepresentations in opposition to the Bankruptcy Plan that the Properties in question were valued at only $33,000,000, when the borrowers had provided appraisals and evidence valuing the Properties at over $58,000,000 and the Plaintiff Lender had only recently purchased the Loan (and the rights to the Indebtedness) at or close to par (*e.g.,* the full amount of the loans)) (*Id.*).

## VI.    Motion to Strike Affirmative Defenses and Cross Motion (003).

On May 14, 2021, Plaintiff ATX2 made a motion to dismiss Defendant's affirmative defenses under CPLR §3211 (R.490-504). Defendant opposed the motion and, in the alternative, made a cross-motion (R.509-642) requesting leave to file an amended answer with more detailed affirmative defenses and a counterclaim ("Proposed Amended Answer") (R.587-606).

The Proposed Amended Answer described the fraudulent, oppressive, improper and willful misconduct by Plaintiff ATX2 in connection with the Rigged Foreclosure Sales and the fraudulent and intentional attempt to manufacture a false deficiency to use to pressure defendant Paul as guarantor as the basis for broader and new affirmative defenses, including equitable estoppel and fraud (R.596-605). In part, the affirmative defenses stated that "Plaintiff's claims are barred by fraud as Plaintiff has engaged in an ongoing fraudulent loan to own scheme, misrepresentations to the Bankruptcy Court and Rigged Foreclosure Sales all done

in order to fraudulently misappropriate the properties and manufacture this improper Guarantor action" (R.604). The Proposed Amended Answer also included a counterclaim seeking a declaration that "this Guarantor action is fraudulent and oppressive and therefore must be dismissed" and cited as a basis, "Plaintiff's acts including, but not limited to, its misrepresentations about the value of the properties to the Bankruptcy Court and Rigged Foreclosure Sales were fraudulent, oppressive and undertaken in bad faith in order to manufacture this Guarantor action" (R.605).

## VII.   <u>Discovery Disputes and Denial of Motion to Stay.</u>

On May 20, 2021, the parties exchanged their document requests and interrogatories. On July 13, 2021, new counsel for Plaintiff ATX2, Mitchell Karlan of Gibson Dunn & Crutcher LLP (whose firm had previously represented certain other companies under the ultimate ownership or management of Defendant Paul) served objections to Defendant's document requests and interrogatories (R.2913,2916-17;R-I.73-90,91-136). ATX2 effectively objected to every request and interrogatory as not material or proportional, and cited to its pending motion to strike affirmative defenses (*Id.*).

By order dated July 16, 2021, the IAS Court denied a second motion by Defendant Paul to stay this action based upon the overlapping issues of fact and law underlying the claims and defenses in this action and in the Wrongful Foreclosure Petition brought by the Borrowers in Texas state court after the Bankruptcy Court

declined to act when the plan of reorganization was rejected by ATX as the lender (R.146). In a harbinger of things to come, the IAS Court expressed a limited view dismissed defendant's concerns about potential inconsistent adjudications by stating that "Don't worry, I'll move this action rally, really fast; and since I'm the court of primary jurisdiction, I'll lead on the issues.  I'm very happy to do that in the Commercial Division in New York County" (R-II.784-5).  The IAS Court essentially stated that the fraudulent, oppressive and willful misconduct by the lender with respect to the Rigged Foreclosure Sales and the manufactured deficiency against the guarantor (R-II.788) was irrelevant, concluding, that "I mean, isn't what's at issue in front of me is whether or not I have an enforceable Guaranty and whether or not there's money owed?  Isn't that what my case -- isn't that my case?" (R-II.792).

Defense counsel and their process server communicated with many of the subpoenaed non-parties, all of whom were affiliated with or associated with Plaintiff ATX2, and they made it clear that they were following ATX2's lead and had no plans to comply with the subpoenas without an affirmative Court order (R-I.340). The facts regarding the service of the subpoenas and the attempts to take discovery, and the IAS Court's denial of Motions006&007 in the "Discovery Denial Order", effectively denying Defendant Paul any discovery of the original lender, Original Plaintiff Ladder, Plaintiff ATX2, or any of their affiliates, agents and non-parties, were detailed in the Brief of Defendant-Appellant submitted on Appeal1 (R.69-125).

The discovery motions were brought by order to show cause, and Defendant Paul was not permitted to submit reply papers or to make a complete presentation of the applications at oral argument (R-I.37,322-323;R-II.518-519). As demonstrated on the certified transcript of the oral argument, which was annexed to and incorporated within the Decision and Order (NYSCEF 265) (R-I.31,34-54), the oral argument quickly devolved into a Q&A in which the IAS Court almost immediately re-focused the argument on the non-party discovery (R-I.38) and then admitted that "I don't understand the scope of those [non-party] depositions is what I'm trying to say" (R-I.40-41), despite the fact that the motion papers clearly detailed the discovery sought in lengthy affirmations (R-I.57-72,339-40) and supporting documentation, including many of the subpoenas themselves (R-I.198-321) and the proposed commissions (R-I.367-494). Notwithstanding the prior submission of the aforementioned documents, at the oral argument, the IAS Court did not appear familiar with any of the defenses contained in the Answer or the Proposed Amended Answer (R-I.34-54), which detailed at length the fraudulent loan to own scheme perpetrated by the Original Plaintiff and Plaintiff ATX2, with the express purpose of declaring defaults under the loans, not permitting any cure by the borrowers through refinancing of the properties in or out of the Texas bankruptcy proceedings and then fraudulently manufacturing a false deficiency to use as leverage against the guarantor in this action to force the guarantor and the borrow to walk away from their tens, if not

hundreds, of millions of dollars in equity in the properties.

In fact, the IAS Court seemed entirely disinterested in any of the defenses raised by the guarantor, citing the language of Section 1.4 of the guarantee, which the IAS Court deems determinative of the lack of availability of defenses, asking rhetorically  ["[s]o then, why would any third-party discovery be relevant, because doesn't Section 1.4 of the guarantee address the issue of offset?" (R-I.39) and then erroneously stating "that's what section 1.4 is, is the guaranty is a separate obligation and whatever defenses the borrower may have, those are available to you . . .") (R-I.44). The IAS Court then implied that somehow the borrowers or the guarantor could and should have asked the Texas State Court that has jurisdiction over the borrowers' Wrongful Foreclosure Proceeding to stay this New York action, stating "so get a stay from them [of] what I'm going to do here . . .  (R-I.48).  The IAS Court then rejected the argument that any evidence that the underlying properties which were foreclosed upon by the lender far exceeded the value of the indebtedness obligations owed by either the borrowers or the guarantor, or the fact that the designated representative of the lender admitted that he believe that the guaranty was an important part of the proceedings in Texas (essentially admitting that the foreclosures were designed to pressure the guarantor), concluding "[i]t's irrelevant … They're not issues at all in my case" (R-I.51). Despite the litany of bad acts, fraudulent, oppressive and willful misconduct (including the Rigged Foreclosure

Sales) that were presented in the papers submitted to the IAS Court, the IAS Court concluded that "The claims related to fraud on the underlying loan applications just happens to be one of those cases that simply doesn't belong here – period. Full stop. Period." (R-I.55). That was the IAS Court's limited view of the defenses presented by the Defendant Guarantor.

## VIII.  **Motion005 – ATX2's Summary Judgment Motion**

On August 6, 2021, while discovery was pending and Plaintiff was due to serve all "third party demands" on non-parties, and without any production or interrogatory responses from Plaintiff ATX2(R.2811), Plaintiff filed a Motion for Summary Judgment (R.2020-3830). As part of its summary judgment motion, Plaintiff submitted the "Second Amended and Restated Guaranty of Recourse Obligations" (R.1021-39,2377-96), and in opposition, Defendant submitted, *inter alia,* the Affidavit of Natin Paul, dated August 25, 2021 (R.2865-85), which essentially mirrored and swore to the allegations of the Proposed Amended Answer (R.587-606) and the Amended Wrongful Foreclosure Petition (R.327-470).

In its motion papers, Plaintiff ATX2 admitted that it only sought an order regarding liability, and conceded that a trial would be required to determine the amount of recoverable damages for a judgment (R.2758). Presumably, such an evidentiary hearing would include a determination of the fair market value of the underlying properties upon which Plaintiff ATX2 had foreclosed as part of the

"Rigged Foreclosure Sales" and had subsequently filed Deeds. The only affidavit containing any recitation of supposed facts was signed by Liz Boydston (R.2805), an outside lawyer from the Polsinelli PC firm who had represented the Original Plaintiff Ladder and Plaintiff ATX2 in opposing the Borrowers' bankruptcy reorganization plans and who, according to Defendant Paul, misrepresented the value of the properties to the bankruptcy court, personally directed the rigged foreclosure sales and assisted in eliminating competitive bidding, represents ATX2 and its affiliates in the Wrongful Foreclosure Proceeding in Texas State Court, and who refused to accept service of a subpoena to testify regarding the allegations of her affidavits (R.2806,2886,2883;R-I.347,369-93). The Polsinelli firm also represents Ladder, and initially represented Plaintiff ATX2, in this action.

Motion006, the first of the two discovery motions on Appeal1, was brought by order to show cause and sought an adjournment of the summary judgment briefing due to the ongoing discovery (R.2811). The IAS Court struck that relief from the order to show cause without any hearing, scheduled Motion 006 to be heard five weeks later (after summary judgment briefing was concluded) and noted that the discovery sought "may be a basis to oppose the summary judgment motion" (R.2803).

Defendant Paul's summary judgment opposition argued the lack of admissibility and impropriety of ATX2 relying upon the Boydston affidavit and the

need to take discovery of facts material and necessary to the claims and defenses, including ATX2's standing to maintain the claims herein (R.2783,2787-88,2796-2800).

### IX.   Motion to Strike the Note of Issue/Certificate of Readiness (008)

On or about October 22, 2021, Plaintiff ATX2 filed, as one document, both the "Note of Issue" (the "NOI") and the Certificate of Readiness for Trial that was attached thereto (the "Certificate") (R.2921-23). On November 12, 2021, Defendant Paul filed a Notice of Motion (R.2907-07) and papers in support of his motion to strike the NOI and Certificate (R.2909-2999,3015-30), which application was assigned Motion008. In that motion, Defendant Paul made the same arguments presented on Appeal1 regarding the denied motions to compel discovery and extend the discovery period (R.69-125), and additional arguments (R.2908-20,3015-30).

### X.   Motion Seq. 009 – Application For Stay Pending Appeal1

Defendant Paul perfected Appeal1 in this Court on February 17, 2022 and immediately filed an application by order to show cause asking the IAS Court to stay all proceedings – including the February 22, 2022 scheduled argument and subsequent decision of Motions003,005&008 (R.54). Motion009 argued that each of these pending motions (and all further proceedings in this action) would rely upon the same core issue that will be necessarily decided in the ongoing Texas Wrongful

Foreclosure Proceeding and by the Appellate Division on Appeal1 – "whether or not the defenses about which the Defendant has not been permitted take discovery in this matter are available to Defendant and relevant to a determination of the merits of the claims under controlling law and the provisions of the Guaranty" (R.66; *see also* R.50-63). The proposed order to show cause was filed on the night of February 17, 2022 (R.48) and Defendant Paul's counsel gave notice of intention to appear at 2:00 p.m. on Friday, February 18, 2022 (R.67). The IAS Court then, without any advance warning, sent an MS Teams invite by email precisely at 4:00 p.m. for counsel to appear and conference the order to show cause (R.3032). Instead of denying the application on the merits, on February 22, 2022, the IAS Court entered a copy of the proposed order to show cause marked "decline to sign" with the date 2/18/2022 and Justice Borrok's initials (R.488-89).

The IAS Court also adjourned the oral argument of the three motions to take place on March 2, 2022, and Justice Borrok himself confirmed that in an email to counsel (R.3033). At 10:11 p.m. on the night before the scheduled oral argument, the law secretary sent an email to ATX2's counsel noting that there was no factual affidavit by a lender representative and asking "please advise if you ever filed or intended to file an affidavit from an employee of the Lender(s) with personal knowledge of the Lender's records or the Borrowers' default under the terms of the loan. In reviewing the documents filed on NYSCEF, it does not appear that such an

affidavit was ever uploaded" (R.3036-37).  ATX2's counsel responded at 10:53 p.m. that the "[t]he Boydston affidavit (docket #208) and its exhibits are movants' submission on these topics.  She testifies that she has personal knowledge of the statements in her affidavit" (R.3037).  Defendant Paul's counsel was never given the opportunity to rebut that misleading statement at oral argument since, at 9:43 a.m. on March 2, the IAS Court canceled the 2 p.m. scheduled oral argument as "unnecessary." (*Id.*)

## XI.   <u>Omnibus Order</u>

In the Omnibus Order, the IAS Court ruled for the lender, Plaintiff ATX2, on all the pending motions, based primarily on the IAS Court's broad view of the Guaranty's waiver of all defenses, a limited and factually erroneous reading of the defenses articulated by Defendant Paul, and without discussing – let alone distinguishing – the controlling law that defenses grounded in fraud (particularly fraudulent acts that occurred after the guaranty was signed) are not waivable as a matter of law.  Despite the fact that the Plaintiff's own summary judgment motion admitted that it sought judgment only on liability, and that an inquest would be needed to establish the amount of a judgment (if any), the IAS Court directed ATX2 to submit a proposed judgment (R.12).

## ARGUMENT

### POINT I:
### <u>Applicable Legal Standards</u>

In an attempt to keep this brief for the combined appeal of three motions to a total of 14,000 words, the standards applicable to each argument are contained within each substantive argument point.

### POINT II:
### The IAS Court Erred In Not Finding That The Guarantor's Defenses Fall Within The Guaranty Waiver Carveout of Willful/Intentional Acts By Lender <u>And Are Unwaivable As A Matter of Law</u>

The IAS Court erred in finding that the Guaranty waived the defenses proposed by Defendant Paul and that the purported waiver was enforceable.

Under Section 1.1 of the Guaranty, Defendant Paul agreed that "Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guarantied Obligations" (R.706-707,1022). The "Guaranteed Obligations" were defined in Section 1.2, and did not include the actual payment of the loan indebtedness by the borrowers, except under certain circumstances (R.707,1022). Notwithstanding the description of the "Nature of Guaranty" in Section 1.3 (R.2383,2631), or the "no offset" provision in Section 1.4 (R.2383,2631) that the IAS Court focused upon, Section 2.14 of the Guaranty specifically carves out a defense by the guarantor for "any act or omission

constituting gross negligence or willful misconduct on the part of Lender and/or its agents" (R.2387,2635).

The defenses enumerated in the Answer (R.1901-06) and Proposed Amended Answer (R.587-606), as verified in the Paul Affidavits (R.529-46,2865-85), are grounded in fraud and other willful misconduct (including oppressive acts) on the part of the lender (ATX2) and its agents, and are same misconduct raised by the borrowers in the Wrongful Foreclosure Proceedings pending in Texas (R.321-473). It is clear that Defendant Paul has the right to raise these defenses, which are nonwaivable under controlling law.

While "[a] waiver of the right to assert a setoff or counterclaim is not against public policy and has been enforced (*Federal Deposit Ins. Corp. v. Frank L. Marino*, 74 AD2d 620 [2d Dept 1980] ["*Marino*"]), the enforceability of a defense waiver is plainly not unlimited. Under New York law, waivers of defenses contained in a guarantee are invalid in cases such as this one where the lender engaged in fraudulent, wrongful and oppressive conduct in order to manufacture a deficiency (see *North Fork Bank v. Computerized Quality Separ*, 62 AD3d 973, 974, 879 NYS2d 575 [2d Dept 2009][A waiver provision "will be enforced <u>in the absence</u> of fraud or negligence in the disposition of collateral"][emphasis supplied]; *see also Sterling Nat. Bank Trust Co. of N.Y. v. Giannetti*, 53 AD2d 533 [1st Dept 1976]["defenses based upon allegations of fraud may not be waived"], *Marino*, 74

AD2d at 620; *In re Futterman*, 602 BR 465 [Bankr SDNY 2019] [applying New York law]).

There is an exception to the presumption of validity of a waiver of defense or claims provision where, as applicable here "fraud or similar deliberately wrongful and oppressive conduct has occurred" (*Futterman,* 602 BR at 478). This is because "New York State has a public policy against permitting a party to use a pre-existing waiver to shield itself from the consequences of its own subsequent fraud" (*Futterman,* 602 BR at 478 [citing *Overseas Private Inv. Corp.*, No. 10 Civ. 7096, 2012 WL 967458 at *7 [SDNY March 14, 2012][case detailing New York's "well-established" public policy and ruling that a waiver did not foreclose a fraud claim under New York even though it was both "unconditional[]" and "irrevocabl[e]"]). In *Futterman*, the court, noted that "[w]here conduct truly is collusive, fraudulent and manipulative, however, a waiver of defenses in a guaranty will not be applied as a matter of public policy" (602 BR at 480-81) and found that the guarantor's "allegations that [the foreclosing party] violated auction rules, discouraged bidders, and/or colluded with bidders, and then falsely reported to the Court that the auction had been conducted at arm's-length and in good faith" was sufficient if proven, to avoid the unconditional and irrevocable defense waivers of the guaranty (602 BR at 481).

In *Sterling Natl. Bk.*, the First Department ruled that a guarantor's waiver was unenforceable as applied to defense based on fraud of the secured party and held that "[t]o the extent, therefore, that any of the stricken counterclaims interposed by the guarantors have articulated a defense of fraud, though denominated as 'off-sets and counterclaims' we have directed that they be reinstated as defenses" (53 AD2d at 533) (*see also Marino*, 74 AD2d at 621] ["So, too, where a viable setoff or counterclaim is asserted based upon the creditor's negligence in failing to liquidate collateral upon the guarantor's demand, such a waiver provision will not be enforced"]).

Defendant Paul's answer, proposed amended answer and his affidavits submitted herewith detail the post-closing conduct by Original Plaintiff/lender Ladder and Plaintiff ATX2 that was knowingly and intentionally fraudulent, oppressive and wrongful. In sum, the lender carried out a sham foreclosure whereby it "won" the auction by manipulating commercially unreasonable terms for the Rigged Foreclosure Sales to suppress actual competitive bidding, and then credit bidding the collateral for far less than the full value of the debt so as to claim a fraudulently manufactured, lingering indebtedness and pursue the guarantor for the deficiency, and remarkably in this case, for the full "indebtedness".

Plaintiff's original answer, interposed before the Rigged Foreclosure Sales completed the loan to own scheme, alleged Plaintiff's fraud on the Bankruptcy Court

as part of the scheme. That paragraph reads, "[p]laintiff's unclean hands include its recent misrepresentation to the Bankruptcy Court in Texas (which resulted in the Bankruptcy Court's denial of the motion to confirm the Debtors' Plan and the lifting of the stay of the foreclosure proceedings) that the Properties in question were valued at only $33,000,000, when the Debtors provided appraisals and evidence valuing the Properties at over $58,000,000 and the Lender had only recently purchased the Loan (and the rights to the Indebtedness) at or close to par, according to Ladder's public earnings report published by *Seeking Alpha* on or about February 26, 2021" (R.1905). This recitation of the Plaintiff lender's fraud clearly satisfies the exception for fraudulent or oppressive conduct that would not be waived under New York's strong public policy.

Defendant Paul's Proposed Amended Answer details even more explicitly the Rigged Foreclosure Sales and the oppressive, fraudulent nature of the lender's loan to own scheme (R.587-606). Defendant Paul has alleged, and provided evidence of, a scheme designed to oppress the Borrowers and the Guarantor, and to manipulate the Properties and the foreclosure process for the purpose of manufacturing a deficiency. As the court held in *Futterman*, "[g]iven the public policies that underly the decisions that have refused to recognize an 'unconscionably low' disposition price, and the fact that the New York courts have regarded such an unconscionable disparity as a form of 'exploitative overreaching, [] this particular defense is not

foreclosed by the waivers in the Guaranty." (*Futterman*, 602 BR at 481). Indeed, a sale of the Silicon Hills Property for a credit bid of $53,000,000 at the Rigged Foreclosure Sale only one month after the same property was bid up to $90,500,000 by ATX2 and another bidder is clearly so low in relation to the "real value as to shock the conscience" and invoke the New York courts' recognized general equitable power to disregard such a sale *vis a vis* the guarantor (*Id.*)

Under the controlling cases, a Plaintiff lender cannot act so reprehensively with such fraudulent bad faith and hide behind a general waiver of defenses and claims.

## POINT III:
## MOTION003 – The IAS Court Erred In Dismissing All Affirmative Defenses

The portion of the Omnibus Order deciding Motion003 and dismissing the affirmative defenses contains clear errors of both law and fact. It quotes elsewhere (R.9) but does not analyze at all the key clause of the guaranty itself, Section 2.14 which actually preserved defenses "constituting any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" (R.9,2387,2635). It also mistakenly states that the alleged fraud was directed at the borrowers, not the guarantor (R.4,8). This ignores the actual facts, that the guarantor is the ultimate beneficial owner of the borrowers (and thus the properties) and the defenses and proposed counterclaim clearly state that the "loan to own scheme"

49

included the fraudulent manufacturing of a deficiency to support claims against the guarantor in order to pressure the borrowers and guarantor to end the Wrongful Foreclosure Proceeding in Texas state court and walk away from the tens (if not hundreds) of millions of dollars of equity in the properties.

The IAS Court also misreads the proposed amended affirmative defenses when it erroneously concludes that "the proffered amendments that the Guarantor proposes fail to establish, even if true, that the Original Lender or the Lender fraudulently induced the Guarantor to sign the Guaranties or fraudulently seek to collect their debt under the terms of the Guaranties" (R.10). As detailed in the factual discussion above, and discussed in Point II, above, that is exactly what the proposed affirmative defenses and counterclaims state, that the entire fraudulent "loan to own scheme" by the "predatory lender" was premised and dependent upon the use of a false, manufactured deficiency against the guarantor to claim in this very action.

Plaintiff ATX2's motion failed to meet the burden of demonstrating that the defense is without merit as a matter of law (*534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick*, 90 AD3d 541, 542 [1st Dept 2011] [ "the defendant is entitled to the benefit of every reasonable intendment of the pleading, which is to be liberally construed [and a] defense should not be stricken where there are questions of fact requiring trial"]). In connection with the cross motion seeking leave to amend and to provide more detail of its counterclaims based in unclean hands and fraudulent,

post-guaranty acts by the lender, Defendant Paul satisfied the low burden of "show[ing] that the proffered amendment is not palpably insufficient or devoid of merit" (*MBIA Ins. Corp. v. Greystone & Co., Inc.*, 74 AD3d 499, 499-500, 901 NYS2d 522 [1st Dept 2010]). The Omnibus Order discussion cites only two cases, the *MBIA* case and *Lewis v. US Bank N.A.,* 186 AD3d 694 [2nd Dept 2020]), presumably for the proposition that only the borrowers could have raised the defenses. However, in *Lewis*, the Second Department panel noted that a prior case was reversed because the Plaintiff had failed to name the bank in the prior action in which he sought to quiet title to real property (*Id.* at 696), and actually denied the Plaintiff's motion to dismiss most of the affirmative defenses, other than the defense of res judicata/collateral estoppel, and specifically affirmed the lower court's decision "not to dismiss the counterclaim sounding in fraud" (*Id.* at 698). That decision actual supports Defendant Paul's position and not the Omnibus Order.

The Omnibus Order acknowledges that the lender's fraud occurred after the Guaranty was signed (R.10-11) yet fails to address the argument (as discussed in Point II, above) that, even if there was a waiver of such defenses and claims, the waiver of fraud claims would be unenforceable as a matter of law, particularly with respect to acts post-dating the signing of the Guaranty.

## POINT IV:
## MOTION005 – The IAS Court Erred In Granting
## <u>ATX2 Summary Judgment</u>

ATX2 made a motion for summary judgment while Defendant Paul and his counsel were totally engaged with the attempts to take discovery from defendant ATX2 and its affiliates and associates (R.2811), and the IAS Court struck the request that Defendant be given an adjournment of the summary judgment filing until after the discovery motions had been decided (without any hearing) from the OSC proposed on Motion 006, scheduled that discovery motion to be heard five weeks later (after summary judgment briefing was concluded) and noted that the discovery sought "may be a basis to oppose the summary judgment motion (R.2803). Defendant Paul filed the summary judgment opposition days later, and detailed the facts already adduced and additional discovery required to fully develop the facts belying the claims and supporting the defenses.

The opposition also argued that the sole factual affidavit submitted in support of summary judgment -- by Liz Boydston, an outside lawyer who had represented the Original Plaintiff Ladder and Plaintiff ATX2 in opposing the bankruptcy reorganization plans and who, according to Defendant Paul, misrepresented the value of the properties to the bankruptcy court, personally directed the rigged foreclosure sales and assisted in eliminating competitive bidding, represents ATX2 and its affiliates in the Wrongful Foreclosure Proceeding in Texas State Court, and

who refused to accept service of a subpoena to testify regarding the allegations of her affidavits (R.2806, 2883,2887;R-I.347,369-93) – did not constitute actual admissible evidence that is necessary to support a summary judgment motion (*Alvarez v. Prospect Hospital*, 68 NY2d 320 [1986]) [noting that "[f]ailure to make such a showing requires denial of the motion" and *citing Winegrad v. New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]]; *Adam v. Cutner & Rathkopf,* 238 AD2d 234, 239 [1st Dept 1997] ["An attorney's affidavit is of no probative value on a summary judgment motion unless accompanied by documentary evidence which constitutes admissible proof"]). The Boydston Affidavit cites to no evidence for those statements of fact, upon which Plaintiff's entire claims are based, and purports to authenticate the "Loan Default Notice" and the "Lease Default Notice" that were purportedly sent by someone else (R.2773).

The law is clear that an affidavit or affirmation by an attorney who does not have personal knowledge of the facts is insufficient by itself in support or opposition to a motion for summary judgment as it lacks probative value (*Wehringer v. Helmsley Spear Inc.,* 91 AD2d 585 [1st Dept 1982], *aff'd* 59 NY2d 688 [1983]). The Boydston Affidavit (R.3818-30) did not satisfy the requirement that admissible evidence be submitted by the lender to establish the existence of the allegedly outstanding obligations under the loan or master lease and the guaranties, the lender's status as a holder in due course, the lender's purported good faith conduct

in dealing with the Guarantor, the value of the Properties taken in foreclosure by the Plaintiff and whether there is any indebtedness at all to support a claim against the guarantor (*see Wells Fargo Bank, Nat. Ass'n v. Stargate Films, Inc.,* 18 AD3d 264, 265 [1st Dept 2005] ["Plaintiff's claim to be a holder in due course, thus entitled to enforce the `hell or high water' clause in the lease regardless of [a] fraud defense, . . . [is] premature . . . [where] issues of fact remain as to whether plaintiff took assignment of the notes in good faith"]; *Lease Fin. Grp., LLC v. Qazi*, 56 Misc3d 944, 59 NYS3d 281, 284 [Civ Ct, NY County 2017] [question of whether plaintiff was holder in due course sufficient to deny summary judgment, particularly where "plaintiff failed to offer an affidavit by anyone with personal knowledge of the original transaction that might bear on resolution of these issues" and "where issues of fact exist, *inter alia*, as to the vendor's alleged fraud and plaintiff's alleged knowledge or notice of such fraud"].)

Courts only grant summary judgment when supported by probative affidavits, such as the plaintiff's chief financial officer (*See Thor Gallery at S. Dekalb, LLC v. Reliance Mediaworks (USA) Inc.,* 143 AD3d 498, 498 [1st Dept. 2016]).  The IAS Court's law clerk clearly recognized this requirement when writing an email to ATX2's counsel the night before asking "please advise if you ever filed or intended to file an affidavit from an employee of the Lender(s) with personal knowledge of the Lender's records or the Borrowers' default under the terms of the loan.  In

reviewing the documents filed on NYSCEF, it does not appear that such an affidavit was ever uploaded" (R.3037-08).  ATX2's counsel responded at 10:53 p.m. that the "[t]he Boydston affidavit (docket #208) and its exhibits are movants' submission on these topics.  She testifies that she has personal knowledge of the statements in her affidavit" (R.3037).  Defendant Paul's counsel was never given the opportunity to rebut that misleading statement at oral argument or to remind the Court that a lawyer's affidavit does not suffice, since, at 9:43 a.m. on March 2, the IAS Court canceled the 2 p.m. scheduled oral argument as "unnecessary" (R.3036).  This was an abuse of discretion.

The IAS Court also erred in granting summary judgment and instructing Plaintiff to propose a judgment without considering the actual fair market value of the Properties that were foreclosed and with respect to which ATX2 and its associates have filed deeds (which far exceed the borrowers' alleged outstanding indebtedness and the foreclosures of which would moot all claims against the guarantor).  Accordingly, Defendant Paul respectfully submits that the grant of summary judgment should be reversed.

### POINT V:
### MOTION008 – The IAS Court Erred By Not Striking the Note of Issue

This is an appeal from the denial of the motion to strike the note of issue and certificate of readiness based on the need for "appraisals of the properties," the

existence of a motion to amend the pleadings, and the need for more discovery (Motion008) (R.3960-4084). With respect to the key issue of the missing discovery, Defendant Paul relies upon the same law, points and authorities cited in support of Appeal1, which sought the discovery that was material and relevant to the claims and defenses presented (R.69-125).

The discovery that Defendant Paul needs to take from ATX2, ATX2's affiant Boydston and 21 other persons or entities affiliated or associated with Ladder and ATX2 is directed at, inter alia, the standing of ATX2 to maintain this lawsuit as a proper assignee of Ladder's rights, whether or not the Properties were in fact valued by Original Plaintiff Ladder and Plaintiff ATX2 (and others) greater than the total amounts purportedly due under the Loans by the Borrowers and therefore whether the indebtedness was satisfied when ATX2 foreclosed on the Properties, whether, as part of the Ladder/ATX2 loan to own scheme detailed in the Wrongful Foreclosure Action and in the Proposed Amended Answer, Ladder and ATX2 engaged in oppressive, bad faith, fraudulent and willful misconduct – including improperly preventing the payment by a bidder in the amount of $90,500,000 for the Silicon Hills Property at the May 4, 2021 foreclosure sale and then suppressing competitive bidders' participation at the June 1, 2021 "Rigged Foreclosure Sales" so as to falsely establish a deficiency and provide leverage to force Defendant Paul to walk away from the Properties that he and the Borrowers maintain are worth more than double

the amounts of the "credit bids" and friendly pricing that ATX2 and its affiliates purportedly paid for the Properties at the Rigged Foreclosure Sales (R.126,2796-2800,2809,2812,2882-83,2918,3026). The discovery sought is of information regarding facts that clearly "bears on the controversary" and will "assist preparation for trial by sharpening the issues" (*Reyes v. Lexington 79th Corp.,* 149 AD3d 508, 51 NYS3d 500, 501 [1st Dept 2017]).

Accordingly, the IAS Court erred when it failed to strike/vacate the Note of Issue and Certificate of Readiness to permit the requested discovery.

### POINT VI:
### The IAS Court Abused Its Discretion
### By Not Even Considering A Stay of The Proceedings Or Signing the OSC on Motion009 And Issuing the Omnibus Order Without Oral Argument

Under CPLR 2201, "a court has broad discretion to grant a stay in order to avoid the risk of inconsistent adjudications, application of proof and potential waste of judicial resources" (*Matter of Tenenbaum,* 81 AD3d 738,739 [2d Dept 2011], *quoting Zonghetti v. Jeromack,* 150 AD2d 561, 563 [2d Dept 1989]). Virtually all of the factual and legal issues to be decided in connection with the Plaintiff's status, standing, unclean hands, and the Guarantor's defenses, are to be decided in the Wrongful Foreclosure Proceeding in Texas state court (*compare* Amended Wrongful Foreclosure Petition [R.321-473] and Proposed Amended Answer [R.587-606]).  As detailed above, the IAS Court refused to consider Motion009, instead

issuing the Decline to Sign Order (R.488-89). Motion009 explained how the "Appellate Division's determination of the Pending Appeal will necessarily address the core issue – whether or not the defenses regarding which the Defendant has not been permitted take discovery in this matter are available to Defendant and relevant to a determination of the merits of the claims under controlling law and the provisions of the Guaranty – which core issue will also need to be decided by the Court in connection with [then-pending Motions003,005&008] and having this action proceed any further without an Appellate Division review of the core issue [on Appeal1] would be a waste of judicial resources (along with risking inconsistent adjudications of the core issue) in the event that, if Defendant is correct, those same defenses are available to be raised by Guarantor herein as by the borrowers [as affirmative claims] in the ongoing Texas [Wrongful Foreclosure Proceeding]" (R.66). Indeed, proceeding with this case involves a great "risk of inconsistent adjudications, application of proof and potential waste of judicial resources" (*See Tenenbaum,* 81 AD3d at 739; *see also Tinicum Financial Corp. v. Lorch,* 226 AD2d 214, 215 [1st Dept 1996] [where other "action involves plaintiff's status as a holder in due course of the note, it puts in issue the enforceability of the note and guarantee sued upon herein, making a stay of the instant action an appropriate exercise of discretion"]; *National Management Corporation v. Adolfi,* 727 AD2d 553 [3d Dept 2000][finding sufficient overlap between foreclosure action and action seeking

payment of accrued debt from borrower to justify a stay of the later filed action]).

While the lender was not required to seek relief in a Texas foreclosure proceeding

against the borrowers before suing the guarantor, ATX2 elected to do so and has

now filed deeds of title to commercial real estate properties worth far more than any

indebtedness owned by the borrowers (and thus mooting claims against the

guarantor). A final disposition of those issues in Texas would avoid inconsistent

adjudications and save New York courts' resources.

After refusing to consider the stay application, the IAS Court then canceled

the oral argument of Motions003,005&008. Motions 003 and 005 had been brought

by ATX2, and Moton 008 had been brought by order to show cause, with no

opportunity for Defendant Paul to file papers in reply to ATX2's opposition.

Defendant Paul had requested the opportunity to address any lingering issues at oral

argument. Under the circumstances, the IAS Court's decision to cancel oral

argument and to plow forward to judgment was an abuse of discretion, and should

be reversed.

## **CONCLUSION**

Accordingly, Defendant Paul respectfully requests that this Honorable Court

reverse the Omnibus Order in its entirety and (i) on Motion003 deny Plaintiff

ATX2's motion to strike the affirmative defenses and grant Defendant Paul's cross-

motion to file the Proposed Amended Answer (with affirmative defenses and

counterclaims), (ii) on Motion005 deny Plaintiff ATX2's motion for summary judgment, (iii) on Motion008 grant Defendant Pauls' motion to strike the note of issue and certificate of readiness on the grounds that the discovery sought by Defendant Paul (and any appropriate follow-up discovery) is material and necessary to the claims and defenses, (iv) find that the IAS Court abused its discretion, and issue an order staying this case until the conclusion of the Wrongful Foreclosure Proceeding in Texas state court, and (v) order that, upon lifting of the stay (or remand), the action and all subsequent proceedings shall be reassigned to another justice of the Commercial Division.

Dated:   Great Neck, New York
             March 21, 2022

Respectfully Submitted:

**MCSHAPIRO LAW GROUP PC**

By: _____.
             Mitchell C. Shapiro
16 Middle Neck Road, #207
Great Neck, New York 11021
(T) 917.446.3628
(F) 646.304.7555
(E) mcs@mcshapirolaw.com

*-and-*

**J. SINGER LAW GROUP, PLLC**
165 Broadway, 23rd Fl.
New York, New York 10006
(T) 917.806.5832
(E) jsinger@singerlawgroup.com

*Attorneys for Defendant Natin Paul*

## PRINTING SPECIFICATIONS STATEMENT

### *Pursuant to Rule 1250.8(j)*

I hereby certify pursuant to 22 NYCRR § 1250.8(j) that the foregoing was prepared in Microsoft Word 2013.

Type:    A proportionately spaced typeface was used as follows:

       Name of Typeface: Times New Roman

       Point Size: 14

       Spacing:  Double

Word Count:  The total number of words in this brief, inclusive of point headings and footnotes, and exclusive of pages containing the Table of Contents, Table of Authorities, and this Printing Specification Statement is 13,972.

                _____

                Mitchell C. Shapiro, Esq.

NEW YORK SUPREME COURT
APPELLATE DIVISION – FIRST DEPARTMENT

---

ATX DEBT FUND 2, LLC,

*Plaintiff-Respondent,*

-against-

NATIN PAUL a/k/a NATE PAUL,

*Defendant-Appellant.*

---

### *STATEMENT PURSUANT TO CPLR §5531*

1.  The index number of this case in the court below is 650728/2020.

2.  The full names of the original parties to this action are set forth in the caption above.  There has been no change.

3.  This action was commenced in the Supreme Court, New York County.

4.  This action was initiated by the filing of a Summons and Complaint on or about January 31, 2020.

5.  This is an action to enforce contractual guaranties.

6.  This appeal is taken from the Decision and Order [Mot. Seq. #s 3, 5 and 8] of the Supreme Court, New York County, Hon. Andrew Borrok, J.S.C., dated March 2, 2022 and entered in the office of the Clerk on March 7, 2022.

7.  This appeal is being made on the fully reproduced record on appeal.