MCSHAPIRO LAW GROUP PC       SCALE LLP
Mitchell C. Shapiro (MS-9019)      Joseph Kiefer (KI-4130)
Three Grace Ave., Suite 100        218 20th Street
Great Neck, New York 11021       Brooklyn, New York 11215
(T) 917.446.3628                (T) 415-735-5933
(F) 646.304.7555                (E) jkiefer@scalefirm.com
(E) mcs@mcshapirolaw.com
*Attorneys for Defendant/Third-Party Plaintiff Natin Paul*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ATX DEBT FUND 1, LLC,

                                        Case No. 19-cv-8540-JPO

           Plaintiff/Counterclaim Defendant

    -against-

NATIN PAUL A/K/A NATE PAUL,

           Defendant/Counterclaim Plaintiff,
-------------------------------------------------------------------x
NATIN PAUL A/K/A NATE PAUL,

           Defendant/Third-Party Plaintiff,

    -against-                    **THIRD-PARTY COMPLAINT**

                                *Jury Trial Demanded*

KARLIN REAL ESTATE LLC, KARLIN REAL
ESTATE 2, LLC, ATX DEBT FUND 2, LLC,
KARLIN ASSET MANAGEMENT, INC., KARLIN
RIVER PLACE, LLC, KARLIN CESAR CHAVEZ,
LLC, KARLIN EAST SIXTH, LLC, KARLIN
MOUNTAIN RIDGE, LLC, KARLIN PHILLIPS
BUILDING, LLC, KARLIN 320 CONGRESS, LLC,
KARLIN 422 CONGRESS, LLC, MATTHEW
SCHWAB, TUEBOR REIT SUB LLC, LADDER
CAPITAL FINANCE, LLC, LADDER CAPITAL
CORP., ELIZABETH NICOLLE (LIZ) BOYDSTON,
JAMES H. BILLINGSLEY, AND JOHN DOE
DEFENDANTS 1-10,

          Third-Party Defendants.

-------------------------------------------------------------------x

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff NATIN PAUL A/K/A NATE PAUL (hereinafter, "Defendant," "Paul", "Guarantor" or "T-P Plaintiff") as and for his third-party complaint against the third-party defendants listed in the caption above and described herein (the "Third-Party Defendants" or the "T-P Defendants"), hereby alleges as follows:

## INTRODUCTION

1.      This third-party complaint is based upon the third-party defendants' participation in the predatory "loan to own scheme" perpetrated in the names of original lender Ladder Capital Finance, LLC ("Ladder"), its corporate affiliate and original Plaintiff TUEBOR REIT SUB LLC ("Tuebor" or "Tuebor-Ladder"), Plaintiff/Counterclaim Defendant ATX DEBT FUND 1, LLC ("ATX1") by those companies and the other third-party defendants (the "T-P Defendants").

2.      As part of their fraudulent "loan to own scheme", predatory lenders and their alter egos and coconspirators manufactured and engineered defaults by the borrowers under the underlying loans (companies under the ultimate management and ownership of T-P Plaintiff Paul) (the "Borrowers") and then engaged in fraudulent misrepresentations and willful misconduct to torpedo the efforts by T-P Plaintiff Paul and the Borrowers to refinance the properties in question and move them out of the Texas bankruptcy court. Notably, those refinancing plans were for amounts far greater than the alleged indebtedness under the Borrowers' loans (including all potential interest and fees).  The underlying properties, which are the collateral for the underlying loans, are valuable commercial real estate properties in Austin, Texas (the "Properties"). The T-P Defendants then conducted a series of sham foreclosure sales of  those Properties in Texas (the "Rigged Foreclosure Sales").

3.      The sham foreclosure sales were conducted in violation of the Deeds of Trust on each property and the Texas Property Code, were not properly noticed, the substitute trustees

appointed by the affiliated predatory lenders did not have lawful authority to sell the properties, and the sales were conducted under fraudulent and unlawful bidding procedures that were not previously disclosed to T-P Plaintiff or any potential competing bidders, including a number that were present and wanted to bid on the Properties at the Rigged Foreclosure Sales but were prevented from doing so by the T-P Defendants and their agents. The Rigged Foreclosure Sales, which were conducted to eliminate any competitive bidding, were merely the latest fraudulent, bad faith, intentionally oppressive acts in the fraudulent "loan to own" scheme regarding the Properties.

4.      In conducting the Rigged Foreclosure Sales, the T-P Defendants colluded and conspired and engaged in willful misconduct to suppress any competitive bidding in order to enable ATX1 to foreclose upon and file deed of title to the Silicon Hills Campus commercial real estate (the "Property" or the "Silicon Hills Property" or the "SH Property") (and other properties owned by other companies under the direct or indirect management or ultimate beneficial ownership of T-P Plaintiff Paul [the "H8 Properties", together with the Silicon Hills Campus, the "Properties"]) for ATX1 and certain of the T-P Defendants at prices unconscionably lower than market value).

5.      The fair market value of the Properties far exceeded the credit bids and friendly bids at the Rigged Foreclosure Sales conducted in June 2021, as well as the total amount of outstanding indebtedness (including all accumulated fees and interest) on the underlying loans that formed the basis for ATX1's claims against T-P Plaintiff Paul as the guarantor under the loans and the virtually identical claim brought by Ladder and then ATX1's affiliate, ATX Debt Fund 2, LLC ("ATX2") in a related action pending in New York state court over the H8 Properties under the guarantor under that loan) (the "NYS Action"). Indeed, the Silicon Hills Property was taken for a foreclosure sale "credit bid" of only $53,000,000 in June 2021, only one month after an agent of

the T-P Defendants improperly voided a competitive bid of $90,500,000 for that same property (which had outbid ATX1's own bid of $90,000,000).

6.      Upon information and belief, Plaintiff/Counterclaim Defendant ATX1 and T-P Defendants KARLIN REAL ESTATE LLC, KARLIN ASSET MANAGEMENT, INC., KARLIN RIVER PLACE, LLC, and other entities are mere alter egos of one another and who, under the direction of other T-P Defendants such as Schwab, set up certain of the other T-P Defendants as mere shells for the purpose of defrauding T-P Plaintiff in order to effectuate the loan to own scheme and effectively steal the Properties from the T-P Plaintiff and the Borrowers (who are companies under the T-P Plaintiff's direct or indirect management or ultimate beneficial ownership). The other T-P Defendants –Schwab, Boydston, Billingsley, and those listed as JOHN DOE DEFENDANTS -- either colluded or conspired in, or actively aided and abetted, the fraudulent actions that comprised the loan to own scheme by the predatory lenders. The foreclosure and filing of deeds of title on the Properties in the names of various Karlin-controlled entities named herein as third-party defendants (and their affiliates) following the Rigged Foreclosure Sales should have mooted all claims against the guarantor, which claims have been continued by the T-P Defendants in this action and the NYS Action for the clear purpose of inflicting damages upon T-Pl Plaintiff Paul in an effort to pressure him, as the ultimate beneficial owner of the Properties, to walk away from the unique and valuable Properties, and the tens, if not hundreds, of millions of dollars of equity in the Properties.

7.      T-P Plaintiff Paul has adduced evidence that the predatory lenders and the T-P Defendants (each of which benefited from the loan to own scheme) have been focused on Mr. Paul and have planned to pressure him using the guarantor actions filed in New York from the beginning of their loan to own scheme, in which they actively deceived the bankruptcy courts presiding over

the failed reorganization plans for the Borrowers that owned the Properties regarding the actual market value, and the likelihood of a refinancing of, the Properties.

## PARTIES, JURISDICTION AND VENUE

8.      Third-Party Plaintiff NATIN PAUL is an individual who, at all relevant times, has maintained his office, principal place of business and residence in Austin, Texas.

9.      Upon information and belief, Third-Party Defendant KARLIN REAL ESTATE, LLC ("KarlinRE") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

10.     Upon information and belief, Third-Party Defendant KARLIN REAL ESTATE 2, LLC ("KarlinRE2") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

11.     Upon information and belief, Third-Party Defendant ATX DEBT FUND 2, LLC ("ATX2") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

12.     Upon information and belief, Third-Party Defendant KARLIN ASSET MANAGEMENT, INC. ("KarlinAM") is a Delaware corporation, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter

ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

13.     Upon information and belief, Third-Party Defendant KARLIN RIVER PLACE, LLC ("KarlinRiverPlace") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

14.     Upon information and belief, Third-Party Defendant KARLIN CESAR CHAVEZ, LLC ("KarlinCesarChavez") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

15.     Upon information and belief, Third-Party Defendant KARLIN EAST SIXTH, LLC ("KarlinE6th") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities")

16.     Upon information and belief, Third-Party Defendant KARLIN MOUNTAIN RIDGE, LLC ("KarlinMR") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

17.     Upon information and belief, Third-Party Defendant KARLIN PHILLIPS

BUILDING, LLC ("KarlinPB") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

18.     Upon information and belief, Third-Party Defendant KARLIN 320 CONGRESS, LLC ("Karlin320") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

19.     Upon information and belief, Third-Party Defendant KARLIN 422 CONGRESS, LLC ("Karlin422") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of New York, and is the alter ego of Plaintiff/Counterclaim Defendant ATX1 and other T-P Defendants (defined below as the "Karlin Entities").

20.     Upon information and belief, Third-Party Defendant MATTHEW SCHWAB ("Schwab") is an individual resident in the state of California, who at all material times to this action, is engaged and has been engaged in business in the state of New York.  Schwab is the co-founder of KarlinRE and, upon information and belief, directed the wrongful actions of ATX1 and the other Karlin entities against T-P Plaintiff Paul, including by orchestrating and directing the Rigged Foreclosure Sales in furtherance of the fraudulent loan to own scheme and personally benefited from that fraudulent, wrongful, oppressive conduct.

21.     Upon information and belief, Third-Party Defendants KARLIN REAL ESTATE LLC, KARLIN REAL ESTATE 2, LLC, ATX DEBT FUND 2, LLC, KARLIN ASSET

MANAGEMENT, INC., KARLIN RIVER PLACE, LLC, KARLIN CESAR CHAVEZ, LLC, KARLIN EAST SIXTH, LLC, KARLIN MOUNTAIN RIDGE, LLC, KARLIN PHILLIPS BUILDING, LLC, KARLIN 320 CONGRESS, LLC, KARLIN 422 CONGRESS, LLC (collectively, with Plaintiff/Counterclaim Defendant ATX Debt Fund 1, LLC, "the "Karlan Entities") and T-P Defendant MATTHEW SCHWAB (collectively, with all the Karlan Entities other than ATX1, the "Karlan T-P Defendants" or the "Karlin Third-Party Defendants") were and are all listed at the same office address and all share the same personnel.

22.     Upon information and belief, Third-Party Defendant TUEBOR REIT SUB LLC ("Tuebor" or Tuebor-Ladder"), is a Michigan limited liability company, was the original Plaintiff that commenced this action in this judicial district, which at apall material times to this action, is engaged and has been engaged in business in the state of New York.

23.     Upon information and belief, Third-Party Defendant LADDER CAPITAL FINANCE LLC ("Ladder"), a limited liability company, is a citizen of New York that maintains offices within this judicial district and was either an alter egos of, or conspired, colluded or aided and abetted Third-Party Defendant TUEBOR, and/or Plaintiff/Counterclaim Defendant ATX1 in the fraudulent loan to own scheme and the other illegal and unlawful acts described herein.

24.     Upon information and belief, Third-Party Defendant LADDER CAPITAL CORP. ("Ladder Corp."), a corporation, is a citizen of New York that maintains offices in New York and was either an alter ego of, or conspired, colluded or aided and abetted Third-Party Defendant TUEBOR, and/or Plaintiff ATX1 in the fraudulent loan to own scheme and the other illegal and unlawful acts described herein.

25.     Upon information and belief, Third-Party Defendant ELIZABETH NICOLLE (LIZ) BOYDSTON ("Boydston") is an individual resident in the state of Texas, who at all material

times to this action, is engaged and has been engaged in business in the state of Texas and conspired, colluded or aided and abetted Third-Party Defendant Tuebor-Ladder, and/or Plaintiff ATX1 and other Third Party Defendants in the fraudulent loan to own scheme and the other illegal and unlawful acts described herein (by actively making misrepresentations or otherwise knowingly engaging in fraudulent or grossly negligent conduct and/or wrongful misconduct such as making false statements to the bankruptcy court regarding the value of the Properties and the likelihood of a successful reorganization through refinancing, orchestrating and directing the Rigged Foreclosure Sales and the administration of ATX1 and ATX2 for the Karlin T-P Defendants in furtherance of the wrongful, fraudulent loan to own scheme, and voluntarily preparing and proffering for filing in the related New York State Action  multiple sworn factual affidavits in in connection with that related guaranty action brought by ATX2 against T-P Plaintiff Paul to pressure T-P Plaintiff Paul to walk away from the equity in the Silicon Hills Property (and certain of the other Properties) that were the crown jewels of the World Class real estate holdings.

26.     Upon information and belief, Third-Party Defendant JAMES H. BILLINGSLEY ("Billingsley") is an individual resident in the state of Texas, who at all material times to this action, is engaged in and has been engaged in business in the state of Texas, and conspired, colluded or aided and abetted Third-Party Defendant Tuebor-Ladder, and/or Plaintiff ATX1 and other Third Party Defendants in the fraudulent loan to own scheme and the other illegal and unlawful acts described herein (by actively making misrepresentations or otherwise knowingly engaging in fraudulent or grossly negligent conduct and/or wrongful misconduct such as directing the loan to own scheme by Tuebor-Ladder beginning with the 2019 misrepresentations regarding the third loan extension, and directing the Rigged Foreclosure Sales for the Karlin Third-Party Defendants and ATX1 (and actually placing bids on their behalf), creating false evidence to be

used in the New York guaranty actions against T-P Plaintiff, all in furtherance of the oppressive, wrongful, fraudulent loan to own scheme.

27.     Upon information and belief, Third-Party Defendants listed as JOHN DOE DEFENDANTS are fictitious names of other persons or entities who were either alter egos of, or conspired, colluded or aided and abetted Plaintiff/Counterclaim Defendant ATX1 and the named T-P Defendants in the fraudulent loan to own scheme and the other illegal and unlawful acts described herein (and which may include other attorneys and agents of ATX1 and the T-P Defendants), and with respect to which T-P Plaintiff is not prepared to join as named T-P Defendants in this action at this time.

28.     This Court has subject matter jurisdiction over this third-party action pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 4(k) and 28 U.S.C. 1367 because the third-party claims brought against them "are so related to the claims [brought by ATX1 against Guarantor Paul] that they form part of the same case or controversy," and because the Third-Party Defendants are properly joined under Federal Rule of Civil Procedure 14.  This Court also has subject matter jurisdiction over Third-Party Defendants KarlinRE, Karlin RE2, ATX2, KarlinAM, Tuebor-Ladder, Ladder, Ladder Corp., Schwab, Boydston and Billingsley under F.C.R.P. 4(k) because each of those defendants are subject to personal jurisdiction in courts of general jurisdiction in New York State.

29.     Ancillary and supplemental jurisdiction and venue is proper in this Court because the claims herein arise out of the same nucleus of operative facts as does the original action, over which this Court already has jurisdiction.

## ADDITIONAL FACTS COMMON TO ALL THIRD-PARTY CLAIMS

30.     Silicon Hills Campus, LLC (the "Borrower"), and additional companies known as the "H8 Borrowers", are companies ultimately owned or managed (either directly or indirectly) by Mr. Paul, and which companies acquired certain real estate properties in separate, open market transactions around May 2018 to July 2018 (the "Properties"). The Properties include several highly desirable properties in downtown Austin, Texas, which is presently one of the hottest cities and real estate markets in the country.In 2018, Ladder Capital Corp. ("Ladder") made the first such loan, to Silicon Hills Campus, LLC, the Borrower on the loan underlying the instant action. That loan is secured by, among other collateral, a 158 plus acre property containing 1.3 million square feet of improvements (including lab space, a conference center, office space and a parking garage), an operating power plant, and a separate parcel of land that housed a billboard (the "Silicon Hills Property" or the "Property"). Ladder purportedly transferred all of its right, title and interest in the Silicon Hills Loan and loan documents to Tuebor REIT Sub LLC ("Tuebor") as the Lender at the time that the loan was closed in 2018. For ease of reference, since this was a concerted effort by Tuebor and its corporate affiliate, Ladder, to engage in a "loan to own" scheme with respect to the Borrowers' Properties. Tuebor is referred to herein as "Tuebor-Ladder".

31.     In exchange for Tuebor-Ladder providing the loan to the Borrower and so that Borrower could purchase and possess the Silicon Hills Property, T-P Plaintiff Paul provided a personal guaranty on the loan. Under the terms of the Guaranty, the Lender was prohibited from engaging in "any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" as specified in Section 2.14 of the Guaranty.

32.     Tuebor-Ladder claims to have transferred all of its rights, title and interest in the Silicon Hills Loan and loan documents, including the guaranty that Paul provided in connection

with the Loan, to Plaintiff ATX Debt Fund 1, LLC in or about December 2020. That purported assignment led to ATX1 being substituted in as Plaintiff in the instant action.

33.     Upon information and belief, ATX1 and the Karlin Entities named as third-party defendants are alter egos of one another who, under the direction of T-P Defendants Schwab, Boydston and Billingsley, set up ATX1 and certain of the other Karlin Entities as mere shells for the purpose of attempting to hide their identities as the parties actually attempting to effectuate a "loan to own" scheme and effectively steal the Properties from T-P Plaintiff Paul and the Borrowers on the underlying loans through the Rigged Foreclosure Sales.  These entities are not lenders, but are ultimately owned and operated by and for the benefit of T-P Defendant Schwab and the parent Karlin entities that own and manage commercial real estate in competition with the Borrowers and with T-P Plaintiff Paul personally.

34.     In August 2019, Tuebor-Ladder and the Silicon Hills Borrower engaged in negotiations and ultimately agreed upon a loan extension of the Silicon Hills Loan to extend the maturity date of the Note from August 30, 2019 to December 2019.  This was the third such extension of the Loan.  Silicon Hills, as the Borrower (and T-P Plaintiff Paul as the Guarantor) detrimentally relied upon Tuebor-Ladder's representation that it would extend the loan on reasonable terms, similar to the prior two extensions that Tuebor-Ladder had given.  T-P Plaintiff Paul had preliminary talks with other potential sources financing to refinance the Property and chose to curtail those efforts and not proceed with those lenders based upon Tuebor-Ladder's representations that there was an agreement to extend on reasonable terms that the parties had negotiated.

35.     The parties exchanged various terms and requirements which resulted in an agreement that Silicon Hills would be required to meet certain requirements prior to August 30,

2019, including the payment of $2,592,954.00 for various purposes, including loan pay-down, taxes, debt service, and extension fee, among other items. Those agreements were included in an email sent by Tuebor-Ladder's Robert Perelman ("Perelman") on August 22, 2019 and then ultimately memorialized in a third amendment to the underlying loan agreement.

36.     The agreement included, without limitation, (i) a payment of $500,000.00 "good faith" deposit by Silicon Hills with Tuebor-Ladder; (ii) Silicon Hill's payment of a $1,000,000.00 principal pay-down plus a $10,000.00 exit fee; (iii) Silicon Hills' payment of $151,250.00 as an extension fee; (iv) Silicon Hills' payment of $716,667.00 for real estate taxes; (v) Silicon Hills' payment of $1,387,824.00 for debt service; (vi) evidence of insurance coverage and fully paid premiums for twelve months; and (vii) an amount to be determined for common area maintenance ("CAM") which included third-party property manager fees, power plant expenses/payroll, property security and insurance.

37.     On August 23, 2019, Perelman sent Silicon Hills an e-mail requesting the $500,000.00 "good faith" deposit be provided pursuant to the accompanying wire instructions. On August 29, 2019 at 3:51 p.m., Tuebor-Ladder sent Silicon Hills an e-mail stating that the $500,000.00 "good faith" deposit had been received and provided an attached "funding sheet" which set forth all of the remaining amounts of money Silicon Hills had to provide to Lender to secure extension of the Loan. At 7:10 p.m. that night, Tuebor-Ladder's counsel sent Silicon Hills a revised copy of the Third Amendment to the Loan Documents and an updated version of the "funding statement." This funding statement, received less than 18 hours prior to the Loan expiration, was dramatically different than what the parties had previously agreed to for the extension. Instead of requiring the payment of approximately $2.5 million dollars, Tuebor-Ladder now demanded payment for $3,217,153.00. Tuebor-Ladder provided no rationale or bases, other

than an arbitrary increase in the Lender's estimate of CMA. On August 29, 2019 at 9:48 p.m., Tuebor-Ladder sent Silicon Hills an acknowledgement that it had submitted its signatures agreeing to the extension to be held in escrow. On August 30, 2019 at 5:55 a.m., Tuebor-Ladder sent to Silicon Hills an e-mail acknowledging its receipt of the fully executed extension documents by Silicon Hills. After the third amendment had been finalized and signatures placed in escrow, at the 11th hour, Tuebor-Ladder insisted that the Silicon Hills Borrower pay $3,217,153.00, or over $700,000 in additional funds, refusing to honor the agreement previously reached by the parties.

38.     When the Silicon Hills Borrower did not pay the additional $700,000 in funds, Tuebor-Ladder then erroneously claimed the Silicon Hills Loan to be in maturity default as of 1:00 p.m. on August 30, 2019, despite the fact that Tuebor-Ladder had previously acknowledged the the extension agreement as having been signed and escrowed. Tuebor-Ladder then abruptly discontinued all communication with Silicon Hills and instead marched to the Texas State courthouse with an *ex parte* Emergency Application for the Appointment of a Receiver over the Silicon Hills Property and sought to place the Silicon Hills Property in receivership. After a series of motions, the Texas state court did appoint a receiver.

39.     Upon information and belief, Tuebor-Ladder (and the T-P Defendants speaking on its behalf, including T-P Defendant Billingsley) intentionally misrepresented to Borrower and T-P Plaintiff Paul that Tuebor-Ladder intended to negotiate the third loan extension in good faith and upon reasonable terms in order to deter T-P Plaintiff Paul from securing alternative financing that would allow him to refinance the Property and avoid maturity default.  T-P Plaintiff and Borrower did in fact rely on Tuebor-Ladder's misrepresentations to their detriment by discontinuing negotiations with Third-Party financing in the reasonable expectation (based upon Tuebor-

Ladder's conduct, statements, and past course of dealings) that Tuebor-Ladder would extend the loan in good faith.

40.      Tuebor-Ladder also engaged in bad faith to manufacturer another purported default of performance under the Silicon Hills Loan, and did so in blatant violation of the Texas state court's order regarding the maintenance of the Property and the payment of fees to vendors from the cash being held by Tuebor-Ladder as the Lender. Approximately $1,050,559.76 in Silicon Hills cash was being held by Lender in reserve to fund operations and development costs for the Property ("Excess Cash Reserve"). The Excess Cash Reserve was funded on a monthly basis by the Silicon Hills Borrower from rental receipts for the Property through the term of the Loan.

41.      Tuebor-Ladder failed and refused to authorize payment of amounts properly payable for operations and development costs, including but not limited to an amount owing to M. Arthur Gensler Jr. & Associates, Inc. ("Gensler") for the preparation of Master Site Planning and Concept Design Studies. Gensler subsequently filed a mechanic's lien, which Tuebor-Ladder then contended was an event of default under the Loan justifying its foreclosure and other remedies.

42.      Upon information and belief, Tuebor-Ladder instead drew those funds and used them to pay itself amounts it asserts are due from the Borrower.

43.      Another such bad faith act by Tuebor-Ladder was its failure and refusal to pay fees that were due and owing to Ameresco, the existing plant operator for the power plant located on the Silicon Hills Property ("Ameresco"). The Silicon Hills Property had been vacated by its tenant, 3M, in August of 2019, and Silicon Hills had negotiated an agreement with Ameresco for the services necessary to continue operating and maintaining the power plant while the Property was vacant so as to avoid degradation of and damage to the power plant and the Property. Ameresco had began its services in August 2019 when it noted that the power plant was in "excellent

condition". On or about October 25, 2019, the Receiver acting on behalf of Tuebor-Ladder entered into an agreement with Tuebor-Ladder to continue the in-place plan to operate the power plant under which the Receiver agreed to pay the fees and expenses for the operation of the power plant, and Tuebor-Ladder was required to provide "funds sufficient to cover" all outstanding and ongoing charges (the "Ameresco Agreement"). Tuebor-Ladder subsequently failed and refused to provide the Receiver with funds sufficient to pay those fees. Tuebor-Ladder's purposeful withholding of payments to the third-party operator of the power plant caused Ameresco to curtail its services and eventually terminate its contract on short notice in December 2019. A replacement vendor, selected by the Receiver was put in place to temporarily maintain basic operations. The new vendor indicated that the power plant was in "fair to poor" condition. Upon information and belief, this deterioration oof condition was a direct result of Tuebor-Ladder's bad-faith refusal to fund Amaresco.  Upon information and belief, that failure and refusal was purposely designed by Tuebor-Ladder to construct a purported emergency situation at the Property that would not have existed had Lender made payment of the fees in question in accordance with Tuebor-Ladder's own representations to the Texas state court and the requirements under the Texas state court order.

44.    Upon information and belief, Tuebor-Ladder intentionally refused to authorize payment of certain vendors from the Excess Cash Reserve in the hope and expectation that those vendors would file a mechanic's lien against the Property, which Tuebor-Ladder could then cite as a default under the terms of the Loan. Indeed, it eventually became clear that Tuebor-Ladder was not allowing the payment of any vendors or mechanics from the Excess Cash Reserve, and it would have been futile for the Borrower to make any further requests, including any request to have Gensler paid in order to remove the mechanic's lien. Accordingly, the filing and maintenance

of any such mechanic's liens against the Property should not constitute a default under the Loan attributable to the Borrower or trigger any remedies under the Loan Documents.

45.     Notably, to protect Tuebor-Ladder financially, the Order Appointing Receiver specifically permitted Tuebor-Ladder to seek Court authorization deeming any advances made by Lender to be part of Silicon Hill's indebtedness. Tuebor-Ladder sought the Court's authorization to advance funds under the Receivership three times. On October 25, 2019, the Court entered an Order Authorizing Lender to Advance Funds to Secured Indebtedness, approving $170,650.00 for certain outstanding utilities invoices and approved adding this amount to the Borrower's debt ("First Payment Order"). On November 19, 2019, Tuebor-Ladder sought and received an Agreed Order Authorizing Lender to Advance Funds to Secured Indebtedness, approving $24,743.50 for certain utilities invoices and $93,307.73 for an entity that could bring the power plant back online, and approved adding these amounts to the Borrower's debt ("Second Payment Order"). On November 21, 2019, Tuebor-Ladder sought and received a third Agreed Order Authorizing Lender to Advance Funds to Secured Indebtedness, approving $34,405.80 for insurance and $33,669.37 for the party related to the power plant, and approved adding these amounts to the Borrower's debt ("Third Payment Order" and together with the First Payment Order and Second Payment Order, the "Payment Orders").

46.     On December 17, 2019, the Borrower learned that Tuebor-Ladder had not paid Ameresco, the power plant operator, or otherwise funded the receiver to make these payments.

47.     The Borrower and T-P Plaintiff Paul's attempts to procure a refinancing of the Property were being stymied by the public disputes over the Property and Tuebor-Ladder's allegations of ongoing damages to the power plant and claims that it was entitled to foreclose on

the Property. The Borrower's attempts to lease the property during this period were similarly stymied.

48.     By sending an erroneous default notice when the Silicon Hills Borrower was not in default of the Loan Agreement as extended, Tuebor-Ladder made a material representation to the Silicon Hills Borrower and to the Guarantor that was false.

49.     Upon information and belief, having no basis for determining that a fully negotiated third extension of maturity date had not occurred, Tuebor-Ladder knew the representation was false at the time it sent the notice, or Tuebor-Ladder recklessly asserted the representation of default without knowledge of its truth.

50.     Upon information and belief, knowing that the Silicon Hills Borrower and the Guarantor would have difficulty securing new financing for the Silicon Hills Property if the Silicon Hills Borrower was accused of being in default of a loan agreement, the Silicon Hills Property was in receivership and the Silicon Hills Property was facing foreclosure, Tuebor-Ladder pursued the wrongful default in order to manufacture a profitable and premature exit from its position as owner of the Loan as part of its "loan to own scheme".

51.     Upon information and belief, Tuebor-Ladder intended to induce the Silicon Hills Borrower and the Guarantor to act upon the fraudulent representation. The Silicon Hills Borrower and the Guarantor actually and justifiably acted upon the representation and thereby suffered injury.

52.     Further, by representing to the Court, to the Receiver and to the Silicon Hills Borrower and the Guarantor, that Tuebor-Ladder would timely make payments to fund the continuous operation of the power plant on the Property, Tuebor-Ladder made material representations that were false. Upon information and belief, having no actual intention to make

the payments as represented, Tuebor-Ladder knew the representations were false at the time it made them.

53.     Upon information and belief, knowing that the Silicon Hills Property would suffer a diminution in value if the power plant was not continuously operated, Tuebor-Ladder intentionally withheld its promised payments to fund the operation of the power plant in order to manufacture a situation where the Silicon Hills Property would be devalued at foreclosure and would drive away potential bidders and Tuebor-Ladder could retain the considerable value in the Silicon Hills Property for itself.

54.     Upon information and belief, Tuebor-Ladder intended to induce the Silicon Hills Borrower and the Guarantor to act upon the fraudulent representation. The Silicon Hills Borrower and the Guarantor actually and justifiably acted upon the representation and thereby suffered injury.

55.     The Texas state court litigation proceedings were suspended when the Silicon Hills Borrower filed a bankruptcy petition seeking reorganization through refinancing of the Silicon Hills Property, which was – at all relevant times -- worth far more than an indebtedness purportedly owed to Tuebor-Ladder.

56.     In January of 2020, almost simultaneously after escalating the dispute with the Silicon Hills Borrower and forcing a bankruptcy filing, Ladder filed a notice of default and notices of foreclosure with respect to the H8 Properties that are owned by the H8 Borrowers.[1] Ladder did

---

[1] The H8 Borrowers are WC Hirshfeld Moore, LLC ("WC Hirshfeld Moore"), WC 805-809 East Sixth, LLC ("WC 805-809 East Sixth"), WC 320 Congress, LLC ("WC320 Congress"), WC 901 EAST CESAR CHAVEZ, LLC (WC 901 East Cesar Chavez"), WC 1910 WEST BRAKER, LLC ("WC 1910 West Braker"), WC 1212 EAST SIXTH, LLC ("WC 1212 East Sixth"), WC 9005 MOUNTAIN RIDGE, LLC ("WC 0995 Mountain Ride"), WC 103 EAST FIFTH, LLC ("WC 103 East Fifth") AND WC 422 CONGRESS, LLC ("WC 422 Congress"). The Property located at 1910 Braker and owned by WC 1910 West Braker was released from the H8 Loan.

so immediately after only one late payment by the H8 Borrowers. To purchase the H8 Properties, the H8 Borrowers had paid approximately $8 million in cash equity of the combined purchase price for the H8 Properties upon acquisition and financed the remaining amounts with a series of loans, which were consolidated into one set of loan document (the "H8 Loan"). The H8 Loan included various guaranties signed by T-P Plaintiff Paul that also contained the same language providing that the Lender was prohibited from engaging in "any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" as specified in Section 2.14 of those guaranties.

57.    Ladder commenced the NYS Action against T-P Plaintiff Paul under the H8 Guaranty in the New York State Supreme Court for the County of New York. The H8 Borrowers each filed a bankruptcy petition seeking reorganization through refinancing. Ladder claims to have transferred all of its right, title and interest in the H8 Loan and loan documents, including the guaranty that Paul provided in connection with the consolidated loans made for the purchase of the H8 Properties, to ATX Debt Fund 2, LLC ("ATX2"), an affiliate of ATX1, in or about December 2020. ATX2 was subsequently substituted in as Plaintiff in the related New York State Action. (ATX1 and ATX2 -- which are apparently corporate affiliate shells that were created under common ownership, management and control of various Karlin T-P Defendants to continue Ladder's "loan to own" scheme with respect to the Properties, are collectively referred to as "ATX".)

58.    Ladder filed and pursued a Motion for Relief from the Automatic Stay for Cause Under 11 U.S.C. §362(d)(1) with Respect to Non-Residential Real Property in the bankruptcy proceedings concerning the H8 Borrowers and the Silicon Hills Borrower.

I.      **Tuebor-Ladder/Ladder/ATX And The T-P Defendants Falsely Represented that The Properties are Undersecured to Pave the Way to Rigged Foreclosure Sales.**

59.     During the course of the bankruptcy proceedings for the Borrowers, Tuebor-Ladder and Ladder, a public company (through their attorneys, Third-Party Defendants Boydston and Billingsley of the firm of Polsinelli PC), vehemently took the position in the bankruptcy court that they were undersecured in the underlying loans, while at the same time their CEO and other executives represented to investors in public earnings reports and public earnings calls that Ladder was vastly oversecured. For example, on a February 27, 2020 earnings call, Ladder CEO Brian Harris was asked how confident he was that he could recover his basis and any accrued interest on the Silicon Hills loan, to which he replied "we're very confident . . . [it] will be a pretty big windfall if we collect all that interest."

60.     Additionally, in urging the bankruptcy court to grant it relief from the automatic stay so that Ladder (or its successor ATX1 and ATX2, with whom Ladder apparently was already in talks or had reached agreement to purchase the H8 Loan and the Silicon Hills Loan) could proceed with foreclosure, Rob Perelman of Ladder testified that Tuebor-Ladder had not taken any impairment or write-down on the Silicon Hills Loan. Tuebor-Ladder and Ladder's statements to the Bankruptcy Court that the Silicon Hills Property and the H8 Properties were worth less than the amount outstanding on the Loans were entirely contrary to its representations made regarding the value of the Loans and underlying collateral in Ladder's public earnings calls, as well as contradictory to the amount for which it subsequently sold the notes to ATX.

61.     On February 26, 2021, Seeking Alpha published the "Ladder Capital Corp. (LADR) CEO Brian Harris on Q4 2020 Results - Earnings Call Transcript" (the "Earnings Call Transcript"). In the Earnings Call Transcript, Paul Miceli (Director of Finance and Chief Financial Officer of

Ladder Capital Corp.) stated that "Ladder reduced its balance of non-accrual loans by 35%, mainly by selling forward defaulted loans at near par value. We sold two defaulted loans in bankruptcy in Austin, Texas, with an outstanding principal balance of $101 million."[2] Additionally, in the Earnings Call Transcript, Marc Fox (Chief Financial Officer of Ladder Capital Corp.) stated that "we mentioned that we sold some non-performing loans this quarter and got almost par for all of them." Further, in the Earnings Call Transcript, Brian Harris (Chief Executive Officer of Ladder Capital Corp.) stated that "we've been able to sell defaulted loans, bankrupt loans, and all of them with a 98-ish type number, you know, across the board."

62.    In other words, Tuebor-Ladder and Ladder, a public company, in order to persuade the Court to lift the automatic stay and allow non-judicial foreclosure sales of the Properties to proceed, falsely represented to the bankruptcy court that Ladder was vastly undersecured in the Loans, and that that the underlying properties lacked equity. At the same time, Ladder publicly reported that the loans were oversecured and it negotiated a loan sale to ATX that allowed nearly a total recovery on the Loans.

63.    In or around December 2020, Tuebor-Ladder and Ladder filed Transfers of Claim Other Than for Security in which they reflected transfers to ATX1 and ATX2 for their claims with respect to the underlying Loans.  Upon information and belief, ATX1 purchased the loan from Tuebor-Ladder at par value, despite Tuebor-Ladder's representations to the bankruptcy court that the loan was vasty undersecured.

64.    The false representations to the bankruptcy court were again advanced by ATX1 and the Karlin T-P Defendants.  Boydston, who had represented Tuebor-Ladder in the bankruptcy proceedings also represented ATX1 after ATX1 assumed the loan and Tuebor-Ladder's claims.

---

[2] Those were clearly references to the loans to Plaintiffs with respect to the Borrowers' Properties, including the Silicon Hills Property.

As ATX1's counsel, Boydston continued to affirmatively (and falsely) report to the bankruptcy court that the Property was worth even less than the amount that ATX1 had paid to purchase the loan in December 2020.

65.     Notably, these false representations to the bankruptcy court were made throughout 2020 and continued through the pendency of the case, well after real property values in Austin, Texas had skyrocketed after the first year of the Covid-19 pandemic, when Tesla had announced its plant relocation to Austin and Austin was designated one of the hottest and fastest growing real estate markets in the United States.

66.     Subsequent events have confirmed that ATX was organized to intentionally obfuscate the identify of its principals and beneficial owners, and ATX vehemently fought any such disclosure in the bankruptcy court proceedings.

67.     When the Borrowers urged that ATX's identify information be disclosed so that the Borrowers could determine if ATX had any previous relationship with the Borrowers or had previously received confidential information about the Properties from the Borrowers, ATX refused.

68.     At one point during the bankruptcy proceedings, the Borrowers and ATX2 had actually agreed to a settlement of the dispute over the motion for relief from stay for the H8 Borrowers and a tentative approval of a reorganization plan. ATX2 then reneged on its agreement in principle when the H8 Borrowers (and T-P Plaintiff Paul) would not acquiesce to ATX2's late demand that in order to agree to the settlement, the Silicon Hills Borrower and T-P Plaintiff Paul would need to stop pursuing discovery in the Silicon Hills bankruptcy proceedings and the guarantor actions regarding the identity of the real owners, managers, members or control persons of ATX.

69.     To further obfuscate the beneficial owners, ATX even had their lawyers – Jesse Shapiro of Gibson Dunn (the same law firm representing it in this action) hire a "front man" named Navid Moshtaghi to act as the only business person for ATX disclosed to the H8 Borrowers or the Silicon Hills Borrower (or their counsel) since the acquisition of the Loans by ATX.

70.     The "straw man" nature of Mr. Moshtaghi became clear in testimony he provided with respect to the Borrowers, in which he confirmed that he was hired by the lawyers for ATX and took all of his direction from the lawyers (e.g., Jesse Shapiro of Gibson Dunn & Crutcher, LLP and Boydston of Polsinelli, PC, the lenders' two law firms in this action).

71.     Despite having been offered as the only disclosed business person associated with ATX. Mr. Moshtaghi testified under oath on behalf of ATX that he knew practically nothing about the ATX2 loan or the Properties. He specifically stated that he wasn't "clear on who the principals [of ATX] are," did not know how much debt was held under the Notes, and had no information at all with regard to the ATX entities or the Properties themselves.

72.     In fact, the <u>only</u> thing Mr. Moshtaghi testified that he knew about the ongoing proceedings and the Loans held by ATX was "that there are guarantees outstanding and that's **a big part of the claim**" (emphasis supplied). This admission was made before the automatic stays were lifted, and before any foreclosure sales were noticed.

73.     This admission indicated that Mr. Moshtaghi was aware that ATX became involved with the Loans – and in particular the Silicon Hills Loan -- with a pre-mediated plan to pursue the guarantees against T-P Plaintiff Paul. Mr. Moshtaghi essentially admitted that the fraudulent scheme by Ladder and then ATX included an intention to force a foreclosure sale that would result in a deficiency to be enforced against the Guarantor.

74.     As detailed below, only later and in connection with ATX's rigged foreclosure sales, did T-P Plaintiff Paul become aware that the beneficial owner of ATX was T-P Defendant Karlin Real Estate, LLC, a company with whom Paul had done repeat business over the last decade, and who had previously received confidential information regarding the Silicon Hills Property long before its formation of ATX to purchase of the Silicon Hills Loan from Tuebor-Ladder under a shell to obscure its identity.

75.     By obfuscating the identity of the true parties who purportedly controlled the claims of the "Lender" under the Loan Documents and the Guaranty, the T-P Defendants intentionally and fraudulently hid key facts from T-P Plaintiff Paul and from the bankruptcy court, which was led to believe that Tuebor-Ladder and Ladder were still the Lender at the time of the hearings in December 2020, that ATX was a proper holder in due course of the Lender's rights and claims under the Loans, and relied upon the opposition of the "Lender" in rejecting the reorganization plans and lifting the stay against foreclosure proceedings.

76.     T-P Plaintiff Paul detrimentally relied upon these fraudulent statements and omissions in not opposing Tuebor-Ladder and Ladder's standing during the December 2020 bankruptcy hearings, ATX's standing as a holder in due course from December 2020, and the applications by Tuebor-Ladder and Ladder to be substituted out as parties in interest.

**II.     ATX's May 2021 Foreclosure Attempt and Bids Over $90,000,000**

77.     In April 2021, ATX1 issued a notice of foreclosure sale of the Silicon Hills Property to be held on May 4, 2021.

78.     Prior to the foreclosure sale, the Silicon Hills Borrower presented a motion to the bankruptcy court to approve $85 million in financing that would have repaid ATX1 *in full* on its

approximately $78 million of claimed outstanding indebtedness. ATX1 opposed the motion and being paid in full, and instead insisted that it proceed with the May 4 foreclosure auction.

79.     At the May 4 auction, competitive bidding took place, with ATX1 bidding against a third-party bidder. The bidding on the Silicon Hills Property reached $90,500,000 with the third-party bidder being the high bidder. ATX1 was the second highest bidder, with a bid of $90,000,000 (which consisted of both a credit bid and additional cash of over $10 million above the outstanding debt ATX1 claimed to be due and owing under the Silicon Hills Note.

80.     ATX1's bidding for the Silicon Hills Property at a price well over the purported outstanding indebtedness on the Loan made clear its true intention in acquiring the Loan from Tuebor-Ladder and rejecting the reorganization plan in bankruptcy and private offers that would have paid off the Loan in full. ATX1 clearly desired to take the Silicon Hills Property for itself in continuation of Tuebor-Ladder's loan to own scheme.

81.     After the third party bidder outbid ATX1, the Substitute Trustee designated by ATX1 mandated the onerous and unusual requirement that the third-party bidder tender the sale proceeds via a cashier's check in the amount of $90,500,000, rather than by wire transfer (as is the usual procedure for foreclosure sales of this size in Travis County, Texas), and required that such cashier's check must be delivered by 3:45 p.m. on May 4, 2021, approximately one hour after the bidding had concluded.

82.     Upon information and belief, the third-party bidder's representative arrived back at the Courthouse to consummate the sale at approximately 3:50 p.m. on May 4, 2020, but the Substitute Trustee had already recommenced a new auction without any other notice to the third party bidder. However, since bidding at the recommenced sale continued past 4:00 p.m., and the Texas Property Code requires sales to be completed by 4:00 p.m., the Substitute Trustee announced

that the May foreclosure sale was adjourned and that foreclosure of the Silicon Hills Property would need to be re-noticed for June 1, 2021.

III.    **ATX's Continued Attempts to take title to the Silicon Hills Property and The H8 Properties through Rigged Foreclosure Sales                   .**

83.    Having been unsuccessful in acquiring the Silicon Hills Property for itself in May, ATX then undertook a scheme to ensure it would come to own all of the Borrowers' Properties it desired at the June foreclosure auction by, among other things, obscuring the bidding procedures, refusing to communicate the bidding procedures to potential bidders, and arbitrarily eliminated T-P Plaintiff Paul and any of his "affiliates" or "associates" from bidding on any of the Properties.

84.    To effectuate the scheme, on May 10, 2021, ATX1 first filed in the Travis County real property records a Notice of Appointment of Substitute Trustee, in which it purported to replace the named trustee under the Deed of Trust for the Silicon Hills Property with nine different substitute trustees, including individuals named Chris Neilson and David Tomek.

85.    On May 10, 2021, ATX2 similarly filed in the Travis County real property records 8 separate Notices of Appointment of Substitute Trustee for the H8 Properties, in which ATX2 purported to replace the named trustee under the Deeds of Trust with nine substitute trustees, again including Chris Neilson and David Tomek.

86.    On May 11, 2021, ATX1 then re-noticed a foreclosure sale of the Silicon Hills Property to be held on June 1, 2021 and Plaintiff ATX2 noticed foreclosure sales of each of the H8 Properties to also be held on June 1, 2021.

87.    However, the foreclosure notices for the H8 Properties and the Silicon Hills Property ("June Foreclosure Notices") contained significant errors that T-P Plaintiff Paul and the Borrowers contend rendered the notices void.

88.     Prior to the foreclosure sales, counsel for the Borrowers informed ATX1, ATX2, and the substitute trustees David Tomek and Chris Neilson, ("Primary Substitute Trustees") of the defects and irregularities of the June Foreclosure Notices prior to the date and time of the sale.

89.     ATX1, ATX2, and the substitute trustees David Tomek and Chris Neilson did not respond to the notices sent by counsel and instead ignored the defects and irregularities of the June Foreclosure Notices. They did not cancel the sales in order to rectify the defects and irregularities as required by law, and instead insisted on proceeding with the foreclosure sales in spite of their invalidity.

90.     Upon information and belief, ATX1 and ATX2 filed the May 11 trustee appointments naming 9 different Substitute Trustees for the H8 Properties and the Silicon Hills Property in order to unnecessarily create confusion for prospective bidders at the foreclosure sale. Upon information and belief, at the time of the notices, ATX1 and ATX2 intended to only utilize the 2 newly added Primary Substitute Trustees (Tomek and Neilson), rather than the other 7 Substitute Trustees who are affiliated with a professional company that regularly conducts foreclosure auctions in Travis County.

91.     Upon information and belief, calls by potential bidders to the Substitute Trustees and to the lawyer representing Tuebor-Ladder and ATX in connection with the Properties, Liz Boydston of Polsinelli PC seeking guidance on the procedures and requirements for the scheduled foreclosure sales in advance of June 1, 2021 went unanswered, and no information was provided. Indeed, one of the appointed Trustees told a potential bidder that they should just show up at the foreclosure sale and the procedures and requirements would be explained on that day.

92.     T-P Plaintiff Paul, along with representatives of the H8 Borrowers and the Silicon Hills Borrower, arrived at the site of the foreclosure sales prior to the noticed time of sale on June

1, 2021. Also at the foreclosure site were several interested bidders who were prepared to bid on the Silicon Hills Property and the H8 Properties with cash in hand.

93.     The site of the foreclosure sale was swarming with over 50 loud protesters rendering the site chaotic and making it nearly impossible to hear any announcements regarding the foreclosure sales. T-P Plaintiff Paul was and is puzzled at the presence of protesters protesting the foreclosure sales, since the foreclosures were of commercial, not residential, properties. Upon information and belief, ATX or its representatives organized, facilitated and/or encouraged the protests as part of their scheme to rig the bidding.

94.     On June 1st, T-P Plaintiff Paul saw the Co-Founder of Karlin, T-P Defendant Matthew Schwab, in attendance at the foreclosure sales. Prior to the time set for the foreclosure sales to commence, Mr. Schwab confirmed in a conversation with Paul and others that that Karlin and Schwab were the controlling persons or owners of ATX who had hidden their identity. Mr. Schwab confirmed that he had been informed that counsel for the Borrowers had noticed ATX of the defects in the foreclosure notices, and stated, "I am aware but we are proceeding anyway and I am going to let the lawyers handle that after the sale."

95.     During the conversation, T-P Plaintiff Paul asked Mr. Schwab which substitute trustee would be conducting sales and how bidders could register to bid. Mr. Schwab coyly responded, "I have no idea."

96.     Conducting any foreclosure sales in the bedlam of the protests, when no one could hear any trustees announcing any particular foreclosure sales, created a situation where there was no public auction, as ready, willing and able bidders were unable to, or were outrighted excluded from, participating.

97.     Mr. Schwab made clear that ATX would proceed with the June 1, 2021 foreclosure sales in spite of the forgoing issues. Mr. Schwab even went so far as to outright declare that he knew that Karlin/ATX would be the winning bidders and own the H8 Properties and the Silicon Hills Property after the auction, stating in sum or in substance, that the defects in the foreclosure sale notices "sound like good claims to raise in litigation; we are going to get these properties today and there is going to be a deficiency, so I'm sure that you will raise that in court."

98.     In other words, Mr. Schwab had prior knowledge of what the results of the auction would be – that ATX1 and ATX2 would win the auctions, purchase the Properties at a steep discount to market value in a rigged bidding scheme, and manufacture a deficiency under the loan for which they intended to seek to recover from T-P Plaintiff Paul as guarantor (or use such claims to pressure T-P Plaintiff Paul and the Borrowers to walk away from their hundreds of millions of dollars in equity in the Properties).

99.     As the foreclosure sales nonetheless proceeded, Tomek and Neilson, acting on behalf of the Plaintiffs, imposed unreasonable, onerous, irregular and oppressive conditions on the foreclosure sale. These actions were clearly designed to exclude the ready, willing and able third-party bidders from the auctions so that competitive bidding would not occur, thereby depressing the sale prices of the Properties, and so that ATX1 and ATX2 could achieve its pre-meditated result – to be deeded the properties for grossly inadequate prices and manufacture deficiencies under the Defendant's guaranties.

100.    The irregular and oppressive conditions included refusing to let any party bid at the foreclosure sale that did not have a pre-prepared cashier's check payable specifically to the foreclosing lender of each of the Properties (ATX1 or ATX2) or in the name of the particular Substitute Trustee conducting the sale (even though there were 9 different Substitute Trustees

listed for the sale of each of the H8 Properties and the Silicon Hills Property). The Substitute Trustees who conducted the sales on June 1, 2021 (Tomek and Neilson) refused to allow bidding by any potential bidder that did not meet this requirement.

101.    T-P Plaintiff Paul and the Borrowers maintain that this requirement runs contrary to the requirements of foreclosure sales under Texas law and under the Deeds of Trust.

102.    T-P Plaintiff Paul and the Borrowers maintain that the foregoing condition is not the standard or typical practice for foreclosure sales in Texas, and is a condition that T-P Plaintiff Paul has never seen imposed in having personally witnessed over 1,000 foreclosure auctions in Travis County over the last 15 years.

103.    A prospective bidder could not have known the required particular substitute trustee payee of the Cashier's Check prior to the commencement of bidding, given that 9 different trustees were listed in the foreclosure notices.

104.    Additionally, the Primary Substitute Trustees refused to speak with T-P Plaintiff Paul and specifically refused to allow T-P Plaintiff Paul or any of his representatives to bid on any of the properties.

105.    T-P Plaintiff Paul also personally witnessed other potential bidders who inquired about how to participate be inexplicably excluded and turned away from bidding.

106.    After excluding T-P Plaintiff Paul and the other bidders (over their objections), the Substitute Trustees conducting the foreclosure sales of the Properties even went so far as to conduct several of the auctions speaking quietly behind a binder so that the public and prospective bidders could not hear or know that an auction was being conducted at all.

107.     Ready, willing and able interested purchasers were, therefore, intentionally prohibited from bidding at the foreclosure sales, resulting in no competitive bidding, and allowing ATX1 and ATX2 to achieve grossly inadequate, below market sales prices of the Properties.

108.     It is clear that the intended result of ATX's unfair, oppressive, fraudulent conduct was to take the Properties and manufacture false guaranty claims against T-P Plaintiff Paul.

109.     For example, ATX1 claims that it successfully won the Silicon Hills Property at the June auction with only a mere $53,000,000 credit bid, a price that was $37,500,000 less than the high bidder at the canceled May foreclosure sale, $37,000,000 (THIRTY SEVEN MILLION DOLLARS) less than ATX1 itself had actually bid itself at the canceled May foreclosure sale, nearly $26,000,000 less than what ATX1 claims was outstanding debt due and owing on the Silicon Hills Loan (including all default interest and fees), approximately only half of the $101,254,533 Travis County Appraisal District tax value of the property, and nearly $150,000,000 (ONE HUNDRED FIFTY MILLION DOLLARS) less than a recent appraisal of the Silicon Hills Property.

110.     The comments made by ATX's Mr. Moshtaghi and Mr. Schwab ahead of the alleged sales -- indicating that they knew in advance that there would be a deficiency after the sales concluded and that ATX would be looking to collect on the guarantees – is evidence of ATX's improper motives and scheme, and that this wholly improper result was intentional, pre-meditated, in bad faith, fraudulent and oppressive.

111.     As ATX1's Primary Substitute Trustees did in the Silicon Hills Property rigged foreclosure sale, the Primary Substitute Trustee acting on behalf of ATX2 imposed the same unreasonable, onerous and oppressive conditions and requirements on the foreclosure sales of the H8 Properties.

112.    Upon information and belief, ATX2 had agreed on this requirement with the Substitute Trustee, and did not disclose the bidding requirements to any other party except for Congress Avenue Holdings, LLC ("Pennybacker") an entity associated with Pennybacker Capital, LLC, with whom Karlin or its affiliates have a previous relationship.

113.    In 2019, Karlin and Pennybacker were familiar with one another because Karlin had previously sold a loan affiliated with T-P Plaintiff Paul to Pennybacker. Once again, this was part and parcel of the overall scheme to take the Properties and engineer fraudulent deficiency claims against T-P Plaintiff Paul.

114.    On June 2, 2021, immediately following the wholly improper and rigged foreclosure auction, the Substitute Trustees appointed by ATX to do their bidding then filed and recorded Deeds for the Silicon Hills Property and the H8 Properties in the Public Records of Travis County, Texas.

115.    The Deed for the Silicon Hills Property contain the incorrect legal description (as was attached to the void foreclosure notice in the first place), an error which had been disclosed to the Substitute Trustee (and to Mr. Schwab) before the rigged foreclosure sale.

116.    The Deed filed by the ATX Substitute Trustee for the Silicon Hills Property purports to transfer the Silicon Hills Property to ATX1 as "Grantee" for a purchase price of $53,000,000.

117.    The Deed filed by the ATX Substitute Trustee falsely represents that the Substitute Trustee had conducted all of the prerequisites to conducting a foreclosure sale, including announcing the bidding conditions, reading the property description, qualifying bidders, and any and all other announcements required prior to opening bidding.

118.    The Substitute Trustee's Deed also indicates that the Silicon Hills auction was completed by 10:05 a.m. – only 5 minutes after the foreclosure sales were allowed to commence by statute. As it would have been nearly impossible to complete all of the prerequisite announcement to opening bidding and complete a sale within 5 minutes, this scenario is entirely unlikely unless there had been cooperation and planning among ATX1 and its appointed Substitute Trustee prior to the foreclosure sale with respect to how to rig the bidding and eliminate any competitive bidding.

119.    According to the void deeds filed by Plaintiff in the local real property records, the results of the Rigged Foreclosure Sales for the H8 Properties were as follows:

a.    10:14 a.m.: 805 E. Sixth St. and 809 E. Sixth St. were purportedly sold to ATX2 for a credit bid of $1 million. (The Substitute Trustee excluded all bidders other than ATX2. The appraisal district had valued those two properties at approximately $2.45 million.)

b.    10:21 a.m.: 9005 Mountain Ridge Drive was sold to ATX2 for a credit bid of $1.5 million. (The Substitute Trustee excluded all bidders other than ATX2. That property was valued at nearly $6 million by the appraisal district.)

c.    10:29 a.m.: 901 East Cesar Chavez was purportedly sold to ATX 2 for a credit bid of $1.5 million. (The Substitute Trustee excluded all bidders other than ATX2. That property was valued at $4.24 million by the appraisal district.)

d.    10:37 a.m.: 305-309 West 9th was purportedly sold for $5.7 million to Pennybacker. (The Substitute Trustee excluded all bidders other than ATX2 and Pennybacker.)

e.  10:49 a.m.: 103 E. Fifth St. was purportedly sold to ATX 2 for a credit bid of $5,000,000. (The Substitute Trustee excluded all bidders other than ATX2. That property was valued at $6.56 million by the Travis Central Appraisal District.)

f.  10:58 a.m.: 320 Congress Avenue was purportedly sold to ATX 2 for a credit bid of $13,200,000. (The Substitute Trustee excluded all bidders other than ATX2 and Pennybacker.)

g.  11:33 a.m. 1212 East Sixth St. was purportedly sold for $5.9 million to Pennybacker. (The Substitute Trustee excluded all bidders other than ATX2 and Pennybacker.)

h.  11:54 a.m.: 422 Congress Avenue was purportedly sold to ATX2 for a credit bid of $10,000,000. (The Substitute Trustee excluded all bidders other than ATX2 and Pennybacker.)

120.   Together, the total prices that ATX2 and Pennybacker supposedly paid for all of the H8 Properties was approximately $43.8 million.

121.   This total of the sums "paid" for all of the H8 Properties by ATX2 and Pennybacker is grossly inadequate in comparison to the market value of the H8 Properties, which were collectively worth in excess of SIXTY-THREE MILLION DOLLARS ($63,000,000) at the time of the rigged foreclosure sales and are worth far more today.

122.   Most importantly, the prices "paid" by ATX2 and Pennybacker were purportedly less than the total amount allegedly due and owing from the Borrowers under the Loans, forming the basis for a pre-mediated, bad faith and manufactured claim under T-P Plaintiff Paul's guaranties.

123.    The foreclosure sales of the Properties that were held on June 1, 2021 (the "Rigged Foreclosure Sales") were improper, illegal, and rigged sales that were part of a fraudulent "loan to own scheme" begun by Tuebor-Ladder and Ladder, and continued by ATX1 and ATX2, which scheme was and fraudulent conduct was designed to result in the ownership of highly desirable and valuable downtown Austin, Texas property by ATX1 and ATX2 and their associates, along with a false and manufactured a deficiency claim against T-P Plaintiff Paul as the Guarantor.

124.    Upon information and belief, ATX1 and ATX2 (or their affiliates and assignees) have claimed to hold title to the Properties, and have filed claims with the insurers for storm damage to the Properties.

125.    Upon information and belief, the Karlin Entities included as Karlin T-P Defendants -- KARLIN REAL ESTATE LLC, KARLIN REAL ESTATE LLC , KARLIN ASSET MANAGEMENT, INC., KARLIN RIVER PLACE, LLC, KARLIN CESAR CHAVEZ, LLC, KARLIN EAST SIXTH, LLC, KARLIN MOUNTAIN RIDGE, LLC, KARLIN PHILLIPS BUILDING, LLC, KARLIN 320 CONGRESS, LLC, KARLIN 422 CONGRESS, LLC --are alter egos of one another and of T-P Plaintiff ATX2 and Plaintiff/Counterclaim Defendant ATX1, since:

a.    Upon information and belief, ATX1 and ATX2 were established as shell companies for the sole purpose of hiding the involvement of the other Karlin T-P Defendants in the loan to own scheme with respect to the Properties;

b.    Upon information and belief, each of the Karlin Entities are ultimately owned and operated by Schwab, and for the personal benefit of Schwab;

c.    Upon information and belief, the Karlin Entities' control over ATX1 and ATX2 is so extensive that ATX1 and ATX2 do not have a separate mind, will or experience and each shares the same officers, employees and offices;

    d.  Upon information and belief, the assets of the Karlin Entities are commingled with one another and funds of one are used to pay the expenses and obligations of the others, and upon information and belief, to pay Schwab and Schwab's expenses;

    e.  Upon information and belief, the Karlin Entities have abused the privilege of doing business in the corporate form by, inter alia, failing to observe corporate formalities and separateness.

126.    Upon information and belief, T-P Defendants Tuebor-Ladder, Ladder and Ladder Corp. (the "Tuebor-Ladder TP Defendants") are alter egos of one another, since:

    a.  Upon information and belief, Tuebor-Ladder was established as a shell company for the sole purpose of making or holding loans on behalf of Ladder, including the loan to Silicon Hills Borrower as part of the loan to own scheme with respect to the Silicon Hills Property;

    b.  Upon information and belief, Tuebor-Ladder and Ladder are ultimately owned and operated by Ladder Corp. for the benefit of Ladder Corp. and its shareholders;

    c.  Upon information and belief, Ladder Corp. included the Silicon Hills Loan and the H8 Loan within the loans that Ladder Corp. reported on collectively to its shareholders;

    d.  Upon information and belief, Ladder Corp.'s control over Tuebor-Ladder and Ladder is so extensive that Tuebor-Ladder and Ladder do not have a separate mind, will or experience and each shares the same officers, employees and offices;

    e.  Upon information and belief, the assets of the Tuebor-Ladder T-P Defendants are commingled with one another and funds of one are used to pay the expenses and obligations of the other;

f.   Upon information and belief, each of the Tuebor-Ladder T-P Defendants have abused the privilege of doing business in the corporate form by, inter alia, failing to observe corporate formalities and separateness.

## THIRD-PARTY CLAIM I
### (Breach of Contract: Against the Karlin Entities Named as Karlin T-P Defendants and the Tuebor-Ladder T-P Defendants

127.   T-P Plaintiff Paul repeats, realleges and incorporates by reference the allegations contained in paragraphs 1-126, above, as though they were fully repeated herein.

128.   The Guaranty constitutes a contract, an agreement between the parties, T-P Plaintiff Paul and the Lender.

129.   Under the terms of the Guaranty, the Lender was prohibited from engaging in "any act or omission constituting gross negligence or willful misconduct on the part of Lender and/or its agents" as specified in Section 2.14 of the Guaranty.

130.   The foregoing conduct attributed to Tuebor-Ladder and to ATX in a continuation of the "loan to own scheme" begun by Tuebor-Ladder and continued by ATX1 constitutes a breach of the terms of the Guaranty.

131.   The breaches of the Guaranty by Tuebor-Ladder pre-date any purported breach by T-P Plaintiff Paul.

132.   Upon information and belief, and based in part on the allegations contained in paragraph 125 above, the Karlin Entities named as Karlin T-P Defendants are alter egos of ATX1.

133.   Upon information and belief, and based in part on the allegations contained in in paragraph 126, above, T-P Defendants Ladder and Ladder Corp. are the alter egos of Tuebor-Ladder.

134.    T-P Plaintiff Paul has been damaged by the foregoing actions by Tuebor-Ladder and ATX1 as the Lender (through the Rigged Foreclosure Sales and the continuation of this action and the NYS Action) that constitute breaches of the Guaranty in an amount to be determined at trial.

135.    Based upon the foregoing, T-P Plaintiff Paul is entitled to recover damages, including reasonable attorneys' fees, from the Karlin T-P Defendants and the Tuebor-Ladder T-P Defendants in an amount to be determined at trial.

## THIRD-PARTY CLAIM II
### (Breach of Implied Covenant and Good Faith and Fair Dealing: Against the Karlin Entities Named As Karlin T-P Defendants and theTuebor-Ladder T-P Defendants)

136.    T-P Plaintiff Paul repeats, realleges and incorporates by reference the allegations contained in paragraphs 1-126, above, as though they were fully repeated herein.

137.    The Guaranty constitutes a contract, an agreement between the parties, T-P Plaintiff Paul and the Lender.

138.    As a party to the guaranty agreement, the Lender (first Tuebor-Ladder and then ATX1), was obligated to comply with the implied covenant of good faith and fear dealing implicit in any contract.

139.    The foregoing conduct attributed to the Tuebor-Ladder and to ATX1 in a continuation of the "loan to own scheme" begun by Tuebor-Ladder and continued by ATX1 constitutes a breach of the implied covenant of good faith and fair dealing.

140.    As a result of Tuebor-Ladder and ATX1's breaches, T-P Plaintiff Paul was deprived of his ability to enjoy the benefits of the Guaranty—namely the securement of the Borrower's

ownership right in the Property, and these breaches were the proximate cause of damages to T-P Plaintiff Paul, including the costs and fees incurred in defending this action and the NYS Action.

141.     The breaches of the implied covenant of good faith and fair dealing by Tuebor-Ladder and by ATX1 pre-date any purported breach of the guaranty by T-P Plaintiff Paul.

142.     Upon information and belief, and based in part on the allegations contained in in paragraph 125, above, the Karlin Entities named as Karlin T-P Defendants are alter egos of ATX1 and of one another.

143.     Upon information and belief, and based in part on the allegations contained in in paragraph 126, above, the Tuebor-Ladder T-P Defendants are the alter egos of Tuebor-Ladder.

144.     Upon information and belief, the foregoing conduct was the proximate cause of damages suffered by T-P Plaintiff Paul (including without limitation the costs and fees incurred in defending this action and the NYS action).

145.     Based upon the foregoing, T-P Plaintiff Paul is entitled to recover damages, including reasonable attorneys' fees, from the Tuebor-Ladder T-P Defendants and the Karlin Entities named as Karlin T-P Defendants, and in an amount to be determined at trial.

**THIRD-PARTY CLAIM III**
**(Conversion: Against the Karlin Entities Named as Karlin T-P Entities)**

146.     T-P Plaintiff Paul repeats, realleges and incorporates by reference the allegations contained in paragraphs 1-126, above, as though they were fully repeated herein.

147.     The T-P Defendants did act with the requisite intent to convert the Properties to their benefit.

148.     Upon information and belief, T-P Defendant KarlinRiverPlace (or another T-P Defendant or alter ego of the Karlin Entities named as Karlin T-P Defendants) (a) has retained

improper possession of the Silicon Hills Property (and the equity in the Silicon Hills Property), rightly belonging to T-P Plaintiff as the ultimate beneficial owner of the Silicon Hills Borrower, and (b) has rendered such Property and equity to be unavailable for T-P Plaintiff's use and benefit.

149.    Upon information and belief,  other Karlin T-P Defendants (or another alter ego of the Karlin Entities named as Karlin T-P Defendants)  (a) have retained improper possession of certain of the H8 Properties (and the equity in those H8 Properties), which rightly belonging to T-P Plaintiff as the ultimate beneficial owner of the H8 Borrowers, and (b) have rendered such Properties and equity to be unavailable for T-P Plaintiff's use and benefit.

150.    T-P Plaintiff is entitled to restitution of the converted Properties, replevin and the recovery for damages including actual damages, compensatory damages consequential and punitive damages in an amount to be determined at trial but in no case less than $200,00,000.00.

151.    In fact, the Karlin T-P Defendants were fully aware that they were intentionally improperly and tortiously interfering with T-P Plaintiff's rights as evidenced by the scheme coordinated by them to undertaken the fraudulent, wrongful and oppressive "Rigged Foreclosure Sales" in order to seize the Properties by using means such as fraud and deceit.

152.    Upon information and belief, and based in part on the allegations contained in in paragraph 125, above, the Karlin Entities named as Karlin T-P Defendants are alter egos of ATX1 and of one another.

153.    T-P Plaintiff is entitled to the (a) recovery for damages including consequential and punitive damages in an amount to be determined at trial but in no case less than $200,000.00, (b) a pre-judgement attachment, replevin and (c) such other and further relief as the Court deems just and proper, as against the Karlin T-P Defendants.

**THIRD-PARTY CLAIM IV**
**(Unjust Enrichment: Against the Karlin T-P Defendants)**

154.     T-P Plaintiff Paul repeats, realleges and incorporates by reference the allegations contained in paragraphs 1-126, above, as though they were fully repeated herein.

155.     Upon information and belief, the Karlin Karlin T-P Defendants were unjustly and improperly enriched at T-P Plaintiff Paul's expense through their actions, including but not limited to the interference with T-P Plaintiff's rights under the Loan Documents and Guaranty, and his rights to the equity in the Properties.

156.     Equity and good conscience warrant that that the Karlin T-P Defendants be prohibited from retaining funds or property which were wrongfully obtained through the knowing interference and conversion with T-P Plaintiff's contractual rights.

157.     In addition, this wrongful conduct was the proximate cause of damages to T-P Plaintiff Paul, including the costs and fees incurred in defending this action and the NYS Action, which damages T-P Plaintiff is entitled to recover from the Karlin T-P Defendants.

158.     Accordingly, T-P Plaintiff Paul is entitled to the recovery for damages (including attorneys fees and costs) from the T-P Defendants in an amount to be determine at trial but in no case less than $200,000,000.00.

**THIRD-PARTY CLAIM V**
**(Fraud: Against All Third-Party Defendants)**

159.     T-P Plaintiff Paul repeats, realleges and incorporates by reference the allegations contained in paragraphs 1-126, above, as though they were fully repeated herein.

160.     The acts of the T-P Defendants, including, but not limited to, their misrepresentations about Tuebor-Ladder's intention to extend the Loan in August 2019, the value

of the Properties (and the chance of a successful reorganization through refinancing of the Properties) to the Bankruptcy Court, and the conduct described as the Rigged Foreclosure Sales, were fraudulent, oppressive and undertaken in bad faith in order to bring and maintain this guarantor action as part of the "loan to own scheme" begun by Tuebor-Ladder and continued by ATX1 and the T-P Defendants, and to fraudulently manufacture false deficiencies under the Loans to use as leverage against T-P Plaintiff Paul as the guarantor in this action and in the NYS Action.

161.   Upon information and belief, and based in part on the allegations contained in in paragraph 125, above, the Karlin Entities named as T-P Defendants are alter egos of ATX1 and one another.

162.   As detailed above, Third-Party Defendants Schwab, Boydston and Billinsgsley actively directed, participated in (by making false statements) and benefited from the fraudulent scheme. Upon information and belief, those acts by Billingsley included the active bidding on behalf of the Karlin Entities at the Rigged Foreclosure Sales, in a concerted effort to manufacture false deficiencies under the loans to be used against T-P Plaintiff Paul as the guarantor in this very lawsuit.

163.   Upon information and belief, those acts by Boydston included the alleged misrepresentations to the bankruptcy court regarding the value of the Properties, misleading communications with purported interested bidders and the coordination of the T-P Defendants' attempts to suppress competitive bidding and the apparent preparation and filing of allegedly false documents.

164.   Upon information and belief, and based in part on the allegations contained in in paragraph 126, above, the Tuebor-Ladder T-P Defendants are the alter ego of Tuebor-Ladder and of one another.

165.     This wrongful and unlawful conduct was the proximate cause of damages to T-P Plaintiff Paul, including the loss of the title, use and equity in the Properties, and the costs and fees incurred in defending this action and the NYS Action, which damages T-P Plaintiff is entitled to recover from all T-P Defendants, jointly and severally.

166.     Based upon the foregoing, T-P Plaintiff Paul is entitled to recover damages, including reasonable attorneys' fees, from all Third-Party Defendants, jointly and severally, in an amount to be determined at trial.

167.     Based on the foregoing, T-P Plaintiff Paul is entitled to an award of punitive damages against all Third-Party Defendants, jointly and severally, in an amount to be determined at trial and believed to exceed $200,000,000.

### THIRD-PARTY CLAIM VI
### (Aiding and Abetting Fraud: Alternatively Pled Against All Third-Party Defendants In the Event That The Court Finds That Any Of Them Are Not Personally Liable Under The Foregoing Fraud Claim)

168.     T-P Plaintiff Paul repeats and realleges the allegations contained in paragraphs 1-126 and 160-167, above, as though they were fully repeated herein.

169.     Upon information and belief, at all times relevant, the aforementioned named T-P Defendants knew of the existence of the wrongful, oppressive and fraudulent foreclosure aimed at seizing the Properties.

170.     In fact, each of the aforementioned TP Defendants advised on, perpetuated and provided substantial planning and assistance to the commission of the fraud, first by Tuebor-Ladder, and then by ATX1. This wrongful and unlawful conduct was the proximate cause of damages to T-P Plaintiff Paul, including the loss of the title, use and equity in the Properties, and

the costs and fees incurred in defending this action and the NYS Action, which damages T-P Plaintiff is entitled to recover from all T-P Defendants, jointly and severally.

171.    Based upon the foregoing, T-P Plaintiff Paul is entitled to recover damages, including reasonable attorneys' fees, from each of the T-P Defendants, jointly and severally, in an amount to be determined at trial.

172.    Based on the foregoing, Defendant is entitled to an award of punitive damages against each of the T-P Defendants, jointly and severally, in an amount to be determined at trial and believed to exceed $200,000,000.

**THIRD-PARTY CLAIM VII**
**(Aiding and Abetting Fraud: Against JOHN DOE THIRD-PARTY DEFENDANTS)**

173.    T-P Plaintiff Paul repeats and realleges the allegations contained in paragraphs 1-126 and 160-167, above, as though they were fully repeated herein.

174.    Upon information and belief, at all times relevant, the JOHN DOE THIRD-PARTY DEFENDANTS knew of the existence of the wrongful, oppressive and fraudulent foreclosure aimed at seizing the Properties.

175.    In fact, each of the aforementioned TP Defendants advised on, perpetuated andprovided substantial planning and assistance to the commission of the fraud, first by Tuebor-Ladder, and then by ATX1.

176.    Based upon the foregoing, T-P Plaintiff Paul is entitled to recover damages, including reasonable attorneys' fees, from the JOHN DOE THIRD-PARTY DEFENDANTS, jointly and severally.

177.     Based on the foregoing, Defendant is entitled to an award of punitive damages against the JOHN DOE THIRD-PARTY DEFENDANTS, jointly and severally, in an amount to be determined at trial and believed to exceed $200,000,000.

## THIRD-PARTY CLAIM VIII
### (Gross Negligence: Against All Third-Party Defendants)

178.     T-P Plaintiff Paul repeats and realleges the allegations contained in paragraphs 1-126 and 162-164 above, as though they were fully repeated herein.

179.     The foregoing acts by ATX1 and Tuebor-Ladder as the Lender under the Loan Documents and Guaranty (along with their alter egos and affiliates and others acting on their behalf), including but not limited to their misrepresentations about the value of the properties to the Bankruptcy Court and the conduct described as the Rigged Foreclosure Sales, were grossly negligent acts by the "lender or its agents".

180.     The foregoing acts, omissions and misconduct smack of intentional wrongdoing or evince a reckless indifference to the rights of others, namely T-P Plaintiff Paul and the Borrowers.

181.     ATX1 and Tuebor-Ladder as the Lender under the Guaranty (and the other Third-Party Defendants  who were their alter egos and affiliates and/or purportedly serving as their agents acting on their behalf), failed to exercise even slight care with respect to the rights of others, namely T-P Plaintiff Paul and the Borrowers.

182.     Upon information and belief, the direct and proximate result of those acts of gross negligence resulted in the purported deficiency allegedly owed by the Borrowers under the loan documents and the claims against T-P Plaintiff Paul brought herein under the guarantees, and were the proximate cause of damages suffered by T-P Plaintiff Paul (including without limitation the costs and fees incurred in defending this action and the NYS action).

183.    Based upon the foregoing, T-P Plaintiff Paul, is entitled to recover damages, including reasonable attorneys' fees, from ATX1 and Tuebor-Ladder as the Lender under the Guaranty and the other Third-Party Defendants,  in an amount to be determined at trial.

184.    Based upon the foregoing, T-P Plaintiff Paul is entitled to injunctive relief, enjoining and restraining ATX1 and its alter egos, affiliates, successors or assigns, or anyone acting in concert with them (including without limitation all the Karlin T-P Defendants), from attempting to enforce the Guarantees against T-P Plaintiff Paul or to collect any purported deficiency under the loans from T-P Plaintiff Paul.

### THIRD-PARTY CLAIM IX
### (Willful Misconduct: Against All Third-Party Defendants)

185.    T-P Plaintiff Paul repeats and realleges the allegations contained in the paragraphs 1-126 and 162-164 above, as though they were fully repeated herein.

186.    The foregoing acts by ATX1 and Tuebor-Ladder as the Lender under the Guaranty (along with their alter egos and affiliates and agents acting on their behalf), including but not limited to, their misrepresentations about the value of the properties to the Bankruptcy Court and the conduct described as the Rigged Foreclosure Sales, were oppressive and undertaken in bad faith in order to bring and maintain this guarantor action as part of the "loan to own scheme" begun by Tuebor-Ladder and continued by ATX1, Ladder, and Karlin, and to fraudulently manufacture a false deficiency under the Loans to use as leverage against T-P Paul as the guarantor.

187.    These foregoing acts were the proximate cause of damages suffered by T-P Plaintiff Paul (including without limitation the loss of title and use and equity in the Properties, and the costs and fees incurred in defending this action and the NYS action).

188.    Based upon the foregoing, T-P Plaintiff Paul, is entitled to recover damages, including reasonable attorneys' fees, from all Third-Party Defendants, jointly and severally, in an amount to be determined at trial.

189.    Based on the foregoing, T-P Plaintiff Paul is entitled to an award of punitive damages against and to be recovered from all Third-Party Defendants, jointly and severally, in an amount to be determined at trial.

190.    Based upon the foregoing, T-P Plaintiff Paul is entitled to injunctive relief, enjoining and restraining ATX1's alter egos, affiliates, successors or assigns, or anyone acting in concert with them (including without limitation the Karlin T-P Defendants), from attempting to enforce the Guarantees against T-P Plaintiff Paul or to collect any purported deficiency under the loans from T-P Plaintiff Paul.

**_WHEREFORE:_**

Third-Party Plaintiff Paul is entitled to and prays for judgment

(a)    awarding T-P Plaintiff Paul compensatory damages from the Tuebor-Ladder Third-Party Defendants and the Karlin Entities named as Third-Party Defendants,  jointly and severally, on the claims of unjust enrichment, conversion, breach of contract or breach of implied covenant of good faith and fair dealing, , in an amount to be determined at trialand believed to exceed $200,000,000;

(b)    awarding T-P Plaintiff Paul compensatory and punitive damages from all Third-Party Defendants, jointly and severally, for the claims of fraud and/or willful misconduct (either directly or for aiding and abetting fraud by Tuebor-Ladder and ATX1) in an amount to be determined at trial and believed to exceed $200,000,000;

Case 1:19-cv-08540-JPO   Document 100   Filed 01/20/23   Page 49 of 50


(c)      awarding T-P Plaintiff Paul compensatory damages from all Third-Party Defendants on the claim of gross negligence, in an amount to be determined at trial and believed to exceed $200,000,000;

(d)      awarding T-P Plaintiff Paul injunctive relief, enjoining and restraining the Karlin T-P Defendants (and any of ATX1's alter egos, affiliates, successors or assigns, or anyone acting in concert with them), from attempting to enforce the Guarantees against T-P Plaintiff Paul or to collect any purported deficiency under the loans from T-P Plaintiff Paul; and

(e) granting T-P Plaintiff Paul such other and further relief as the Court deems just and proper.

Dated: Great Neck, New York
      January 20, 2023

                                     Respectfully Submitted:

                                       **MCSHAPIRO LAW GROUP PC**
                                     By: */s/   Mitchell C. Shapiro*            .
                                          Mitchell C. Shapiro (MS-9019)
                                     Three Grave Avenue, Suite 100
                                     Great Neck, New York 11201
                                     (T) 917.446.3628
                                     (F) 646.304.7555
                                     (E) mcs@mcshapirolaw.com

                                           *- and -*

                                     **SCALE LLP**
                                     By: */s/    Joseph Kiefer*            .
                                           Joseph Kiefer (KI-4130)
                                     218 20th Street
                                     Brooklyn, New York 11232
                                     (T) 415-735-5933
                                     (E) jkiefer@scalefirm.com

                                     *Attorneys for Defendant/Third-Party*
                                     *Plaintiff Natin Paul*

*Third-Party Complaint 03212022/01202023*     49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing *[corrected] Third-Party Complaint* was filed with the

Clerk of the Court by using the CM/ECF system, which will send a notice of filing to the

following counsel of record:

**Adam John Jantzi**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue
New York, NY 10166
Tel: 212-351-2436
Email: ajantzi@gibsondunn.com

**Mitchell Alan Karlan**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue
New York, NY 10166
Tel: 212-351-3827
Fax: 212-351-5254
Email: mkarlan@gibsondunn.com

**Bradley Robert Gardner**
Polsinelli PC
900 W. 48th Place
Suite 900
Kansas City, MO 64112
Tel: 816-753-1000
Fax: 816-753-1536
Email: bgardner@polsinelli.com

By: */s/   Mitchell C. Shapiro*
Mitchell C. Shapiro