UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATX DEBT FUND 1, LLC,

                              Plaintiff,

              -v-

NATIN PAUL,

                              Defendant.

19-CV-8540 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

This is an action on a loan guaranty filed by Plaintiff ATX Debt Fund 1, LLC ("ATX")
against the guarantor on the loan, Defendant Natin Paul, also known as Nate Paul.  Paul has
asserted counterclaims against ATX sounding in contract and the tort of fraud under New York
law.  ATX has moved to dismiss Paul's counterclaims for failure to state a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, ATX's motion to
dismiss Paul's counterclaims is granted.

I.      Background

The facts below are drawn from Paul's Answer and admissions in response to the Second
Amended Complaint (ECF No. 26 ("SAC"); *see also* ECF No. 49 ("Answer")) and are assumed
to be true for the purposes of ATX's Motion to Dismiss the counterclaims.

    A.      The Loan Agreement and Terms

In February 2018, Ladder Capital Finance LLC ("Ladder"), the original lender, entered
into a commercial mortgage agreement (the "Loan") with Silicon Hills Campus, LLC
("Borrower") in the amount of $64,000,000.  (*See* Answer ¶ 7.)  The Loan was secured by a
complete interest in a piece of real property located in Austin, Texas (the "Property" or
"Attachment").  (*See id.*)  The original lender, Ladder, eventually assigned its entire interest in

1

the Loan to ATX Debt Fund 1 ("ATX"), the Plaintiff in this case.   (The Court will use the term

"Lender" to refer to ATX or the lender at the pertinent time.)  As a condition for the Loan, Natin

Paul ("Paul" or the "Guarantor") entered into a guaranty agreement (the "Guaranty") in which he

promised an "irrevocable, absolute, [and] continuing" Guaranty of Recourse Obligations under

the terms of the Loan on February 6, 2018.  (Answer ¶ 1; SAC ¶¶ 8 – 11.)  The Guaranty

provided that the Guarantor personally and "unconditionally guarantee[d] payment" of

Borrower's full obligations on the Loan.  (Answer ¶ 1.)  Moreover, the Guaranty provided that

the Loan and any other fees, costs, and expenses would be "fully recourse to Guarantor" upon

certain triggering events, including in the event of Borrower filing a voluntary bankruptcy

petition.  (*See* Answer ¶ 1; SAC ¶ 12.)  As a part of the Guaranty, Paul also agreed to a broad

waiver provision which "waived any common law, equitable, stator or other rights" held by the

Guarantor relating to issues arising out of the Guaranty transaction.  (Answer ¶ 1; *see also* ECF

No. 26-1.)

One two separate occasions, first in May 2019 and again in July 2019, Borrower

requested, and Lender agreed to, an extension of the maturity date of the Loan such that, after

both amendments, the Loan would ultimately mature on August 30, 2019 (provided that certain

conditions, not relevant here, were also met).  (*See* Answer ¶¶ 8 – 9.)

B.      **The Default**

A third extension of the maturity date of the Loan was not entered, and, as a result,

Borrower defaulted on the Loan by failing to make timely payment on its obligations on August

30, 2019.[1]  (*See* Answer ¶ 8.)  At approximately the same time, Borrower also failed to tender

---

[1] ATX clearly alleges that Borrower defaulted by this date; Paul concedes this allegation
of the Amended Complaint in broad strokes.   (*See* Answer ¶ 9; *see also* Answer ¶ 1; AC ¶ 23.)

$3,000,000, which it had agreed to pay Lender as consideration for agreeing to extend the maturity date of the Loan.  (*See* SAC ¶ 26.)

Paul also includes allegations about the bargaining process leading up to Borrower's failed attempt to secure a third extension of the maturity date.[2]  Paul asserts that, during August 2019, Borrower and Lender "agreed . . . to extend the maturity date [of the Loan] . . . to December 2019," for a third time.  (Answer ¶ 8.)  On Paul's account, Lender and Borrower were on the precipice of brokering a third extension when Lender, for reasons Paul chalks up to strategy, added additional costs for Borrower, scuttling a nearly completed transaction "at the 11th hour."  (Answer ¶ 9.)  Specifically, Lender initially had agreed to a $2,500,000 premium payment in exchange for its agreement to extend the maturity date of the Loan, but, before this contract was entered, it demanded approximately $700,000 more, causing Borrower to walk.  (Answer ¶ 10.)  As context, Paul alleges the August deal's blow-up was "less than 18 hours prior to the Loan['s] expiration," creating a tense and adversarial bargaining environment with existential stakes for, at least, Borrower and potentially also for the Lender.  (Answer ¶ 9.)  As pleaded, however, Paul does not allege that the third extension was anything but hypothetical, even acknowledging that the Lender ultimately withheld agreement and assent to the extension because, as stated, Borrower failed to satisfy Lender's final conditions.  (*See id.*)  Paul alleges that Borrower had fully performed its obligations as it understood them under the rough blueprint of a third maturity date extension agreement, except for tendering the additional $700,000.  (*See* Answer ¶¶ 9 – 11.)

---

[2] The Court accepts all of Paul's well-pleaded factual allegations as true, as it must on a motion to dismiss.  However, the same deference does not apply to Paul's legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2007).

When Borrower defaulted, Lender elected the on-contract remedy of receivership for the Property (which secured the Guaranty) in Texas state court. Lender promptly filed an emergency application to appoint a receiver for the Property on or about September 1, 2019; eventually, a receiver was appointed. (*See* Answer ¶ 10.) The Lender — at this time, Tuebor REIT Sub LLC ("Tueber")[3] — also initiated this action to enforce its rights against Paul under the Guaranty. (*See* ECF No. 1.)

Paul also alleges that, in violation of the receivership order, Lender failed to "maintain[] . . . the Property" and that Lender failed to tender "payment of fees to vendors" from the cash reserve held by Lender pursuant to the Loan agreement. (*See* Answer ¶ 11.) Lender maintained a significant cash reserve which was "funded on a monthly basis by the . . . Borrower from rental receipts for the Property through the term of the Loan." (*Id.*) During the receivership, Paul claims that Lender should have used this pot of money to pay for Borrower's unpaid contractual obligations on the land.

### C.   The Chapter 11 Proceeding

According to Paul, Borrower had no choice but to file for federal Chapter 11 bankruptcy and reorganization in a last-ditch effort to halt the foreclosure sale of the Property, and it did so in January 2020.[4] (*See* Answer ¶¶ 23, 25.) Pursuant to this bankruptcy petition, Bankruptcy Judge Tony M. Davis of the Western District of Texas entered an automatic stay and channeling injunction, pausing the foreclosure sale in the state receivership proceeding. (*See* Answer ¶ 24.) In the bankruptcy, not only were Borrower and Lender (as debtor and creditor) parties, but Paul

---

[3]Ladder assigned both the Loan and Guaranty to Tueber on February 8, 2018, just after entering both agreements. (ECF No. 26-5.) Tueber later assigned both interests to ATX after the commencement of this action.

[4] *See generally In re Silicon Hills Campus, LLC*, No. 20-10042-TMD (Bankr. W.D. Tex. 2020) (the "bankruptcy proceeding").

himself appeared through counsel, one of Borrower's creditors.  And Paul now reveals that at least by this time, Borrower was wholly owned by either Paul personally or subsidiary corporations themselves wholly owned by Paul.  (*See* ECF No. 85 ("Opp.") at 20 – 22.)

In the federal bankruptcy action, Lender quickly moved to set aside the automatic stay and to force foreclosure on the basis that there was no reasonable possibility that reorganization of the debtor (that is, the Borrower) would prove viable and sufficient to cover the debtor's obligations.  (*See* Answer ¶ 25; ECF No. 69-2.)  In response, Judge Davis conducted two full days of evidentiary hearings, featuring both factual and expert testimony from, *inter alia*, Lender, Borrower, and Paul, as well as experts supporting the positions of each.  (*See* Answer ¶¶ 26, 28, 29; ECF Nos. 69-3, 69-4, 69-5.)

The disposition of Lender's motion to lift the stay turned on the court's (statutorily required) determination that the Borrower had no equity in the Property, which was worth, at most, "$53 million," but was subject to "debt [that] is well in excess of 60 million dollars." (ECF No. 69-5 ("Bankr. Ord.") at 4 – 5.)  On this basis, Judge Davis granted Lender's motion to set aside the stay based on the resolution of two separate but related issues.  The nexus of the dispute between Lender and Borrower was twofold.  First, Borrower argued that the valuation of the Property was significantly higher than as argued by Lender, meaning that reorganization with an equity cushion was more probably achievable than Lender contended.  Second, Borrower argued that unconsummated oral offers and statements made by various parties and non-parties to the litigation showed that a possible reorganization plan via external financing was feasible in the short term.  The court rejected both arguments.

*First*, the issue of valuation: Judge Davis heard direct testimony and cross-examination from expert witnesses for both sides, ultimately finding that the expert relied on by Borrower had

employed a wholly unreliable methodology which was "irrelevant" for casting light on the real valuation of the Property, going on to describe the testimony and report of Paul's expert (the same one relied upon here) as "speculative and indefensible," as well as substantially based on "no evidence." (Bankr. Ord. at 4 – 5.)  By contrast, the court found Lender's expert, who assessed a valuation of $53,000,000 for the Property, to be "reasonable" and "credible" as well as to have been based on a reliable method reliably applied.  (Bankr. Ord. at 5.)  Judge Davis ultimately found that Lender's "was the only valuation evidence in the record because the methodology used by Debtor's appraiser . . . was not credible." (*Id.* at 5.)  Paul, testifying apparently as a fact witness, also opined on his own views of the Property's valuation, but the court rejected his opinion as similarly uncredible and unsupported, even if the court were willing to entertain his opinion as expert testimony (which it was not).[5]  (Bankr. Ord. at 7.)  To reach this conclusion, the court also rejected as unpersuasive two pieces of factual evidence.  First, Paul and Borrower had pointed to statements made by agents of Lender in earnings calls with shareholders, which Paul and Borrower interpreted as suggesting a much higher valuation than $53 million.  The court considered and rejected this evidence, reasoning that the "investor calls were not an admission of [the Property's] greater value.  Indeed, they really did not address the issue [of valuation] in a meaningful way."  (Bankr. Ord. at 8.)  Borrower and Paul also proffered evidence of certain SEC disclosures as well as purported alternative offers to finance

---

[5] The bankruptcy court rejected Paul's testimony for several reasons.  First, the court questioned Paul's credentials and the rigor of his methodology:  "[W]hile Mr. Paul appeared knowledgeable and experienced in the industry, he did not approach these issues [of valuation] with anywhere near the rigor or detail that [Lender's expert] did . . . ." (Bankr. Ord. at 7.)  Second, the court concluded that aspects of Paul's opinions on appraisal were so incomplete and so lacking in "offer[ing] specifics" to explain their method that the court was "again" left "with only the estimates provided by [Lender]."  (Bankr. Ord. at 8.)  Judge Davis also pointed out inherent tensions between the testimony of Borrower's expert and that of Paul, which painted Paul in a less-than-credible light.  (*Id.*)

reorganization, stating that the court did not consider either source of evidence to be "of value in any meaningful way." (*Id.*)

*Second*, the issue of a reasonable prospect of reorganization:  On this issue, Judge Davis assessed that because the sole credible valuation figure ($53,000,000) was less than the amount owed, it was very unlikely that reorganization could be successful.  (Bankr. Ord. at 9.)

On November 24, 2020, the bankruptcy court formally lifted the automatic stay, which empowered Lender to pursue foreclosure on the Property via state court proceedings.  (Bankr. Ord. at 1.)  Shortly afterward, on December 7, 2020, Borrower and Paul filed a timely appeal of Judge Davis's order to the United States District Court for the Western District of Texas.  (See ECF No. 69-7 (citing *Silicon Hills Campus, LLC v. Tuebor Reit Sub, LLC*, No. 1:20-cv-1201-DAE (W.D. Tex. 2021 Feb. 14, 2022).)  On appeal, U.S. District Judge David Alan Ezra affirmed all the bankruptcy court's holdings.  Specifically, the district court held that the bankruptcy court properly "consider[ed] both appraisals in arriving at the market value for the property," and that it was "not legal error" for Judge Davis to "disregard" entirely "an appraisal . . . that was not credible, not based on reasonable costs, and that did not employ proper methodology."  (ECF No. 69-8 ("Dist. Op.") at 13 – 14.)  Judge Ezra agreed with the bankruptcy court that while there was some evidence that "Lender and Debtor [had] . . . completed two . . . maturity extensions," attempts to negotiate a third in August 2019 had failed to produce an enforceable agreement, and, accordingly, resulted in Debtor's "default."  *Id.* at 3.

Indeed, in reviewing the bankruptcy court's valuation determination specifically, Judge Ezra applied *de novo* review, noting that valuation is a mixed question of law and fact.  *See id.* at 5 (internal citations omitted).  The district court clarified that rejecting Paul and Borrower's expert as wholly uncredible was well within the bankruptcy court's legitimate discretion.  *See id.*

at 7.  And the district court specifically affirmed Judge Davis's decision not to credit Borrower's

expert as not approaching "clear error."  *Id.* at 10 – 11.  The district court also affirmed the

bankruptcy court's decision to entirely reject Borrower's appraisal because that testimony, and

Borrower's expert report, were premised on application of a standard to assess valuation that was

legally erroneous given the context.  *See id.* at 13.

Separating the issue of whether reorganization could happen in a reasonable time from

the issue of valuation, the district court emphasized that "the valuation finding by the Bankruptcy

Court was adequately supported by the evidence and [is] neither factually nor legally erroneous."

*Id.* at 14.  As such, the district court held that "[b]ased on the Bankruptcy Court's valuation,

[Borrower] did not have equity in the property because the property's value is $53 million, and

the debt owed is over $64 million."  *Id.*  The court further explained:

> Viewing all the evidence, this Court concludes that the valuation
> finding by the Bankruptcy Court is adequately supported by the
> evidence is neither factually nor legally erroneous.   And the
> Bankruptcy Court in this case justifiably exercised its discretion in
> choosing to rely on [only Lender's appraisal] . . . .  Based on the
> Bankruptcy Court's valuation, [Borrower] did not have equity in the
> Property because the Property's value is $53 million, and the debt
> owed is over $64 million.

*Id.* at 14 (internal citations omitted).

### D.    Procedural History

As Lender, ATX sues here to enforce the terms of the Loan and Guaranty against Paul,

the Guarantor.  The Court assumes familiarity with the background of the primary claims based

on the Court's prior orders and the filings and transcripts of conferences in this matter.  (*See,

e.g.*, ECF No. 28 ("MTD Op."); *see also* ECF No. 44.)  ATX filed the Second Amended

Complaint on January 10, 2020.  (*See* SAC ¶ 1.)  After a stay of the case, Paul filed his Answer

and counterclaims on March 7, 2022.  (*See* Answer ¶ 1.)

Paul's counterclaims parallel the arguments that Borrower raised before the bankruptcy court. First, Paul alleges contractual breach against ATX. (*See* Answer ¶¶ 101 – 06.) Second, Paul claims breach of the implied duty of good faith and fair dealing. (*See* Answer ¶¶ 107 – 11.) Third, Paul claims that ATX's conduct, from the decision not to extend the maturity date of the loan up to and including its bankruptcy filings, amounted to common law and statutory fraud under New York law. (*See* Answer ¶¶ 112 – 15.) Paul seeks compensatory and punitive damages, as well as a declaratory judgment on these claims. (*See* Answer ¶¶ 98 – 100.)

## II.    Legal Standards

### A.    Motion to Dismiss

"A motion to dismiss a counterclaim is evaluated under the same standards as a motion to dismiss a complaint." *Renovate Mfg., LLC v. Acer Am. Corp.*, 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013) (internal citations omitted). Accordingly, to survive ATX's motion to dismiss under Rule 12(b)(6), a court will assume the truth of all well-pleaded allegations and ask whether they "would state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be plausible, a complaint must, at minimum, plead specific and particular facts that, if true, would satisfy the elements of their cause of action. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")

### B.    Federal Collateral Estoppel

Where, as here, a federal court must "determin[e] the preclusive effect of a federal judgment," rather than a state court judgment, it must "apply federal law" of preclusion.[6] *Marvel*

---

[6] Paul appears to concede that federal, not New York or Texas, collateral estoppel doctrine governs the effects of the bankruptcy order. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (noting that "implied consent is . . . sufficient to establish the applicable choice of law") (internal quotation marks omitted); *In re Snyder*, 939 F.3d 92, 100 n.

*Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  For collateral estoppel purposes, a

bankruptcy court order is one such federal judgment, meriting the application of federal

preclusion law.  *See Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006).

Under federal law, the doctrine of collateral estoppel "has the dual purpose of protecting

litigants from the burden of relitigating an identical issue with the same party or his privy and of

promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v.

Shore*, 439 U.S. 322, 327 (1979) (citing *Blonder-Tongue Labs., Inc. v. Univ. Ill. Found.*, 402

U.S. 313, 328-29 (1971)).  Collateral estoppel "bars relitigation of any factual or legal issue that

was actually decided in previous litigation 'between the parties, whether on the same or a

different claim.'" *Dennis v. Rhode Island Hosp. Tr. Nat. Bank*, 744 F.2d 893, 899 (1st Cir. 1984)

(quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)) (emphasis in original).

When a party seeks to invoke collateral estoppel based on a prior federal bankruptcy

order, a federal court must test the bankruptcy order against "federal principles of collateral

estoppel," which require that:

> (1) the identical issue was raised in a previous proceeding; (2) the
> issue was actually litigated and decided in the previous proceeding;
> (3) the party had a full and fair opportunity to litigate the issue; and
> (4) the resolution of the issue was necessary to support a valid and
> final judgment on the merits.

*Ball*, 451 F.3d at 69 (quoting *Purdy v. Zeldes*, 337 F.3d 253, 258, 258 n. 5 (2d Cir. 2003)

(internal quotation marks omitted)); *see also In re Snyder*, 939 F.3d 92, 100 (2d Cir. 2019)

(citing *Ball*, 451 F.3d at 69–70) (applying federal rules of collateral estoppel in bankruptcy

context).  Additionally, a bankruptcy court's judgment on necessary issues, if affirmed by the

---

2 (2d Cir. 2019) (holding that because one party's silence, or else that party's implicit agreement
communicated by silence, was sufficient to conclude that all "parties agree[d] federal preclusion
law applie[d]").

district court on appeal, is a final judgment for purposes of collateral estoppel. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992), *cert. denied*, 508 U.S. 952 (1993).

## III.    Discussion

### A.    Impact of Collateral Estoppel as to Property's Valuation

If collateral estoppel applies to the bankruptcy court's valuation of the Property, then Paul's counterclaims must be dismissed. That is because each of the counterclaims is premised on the allegation that the Property is worth more than $53 million. If the bankruptcy court's valuation is binding, Paul is precluded from making any plausible allegation of injury or damages. Injury is an essential element of fraud under New York law. *See Pasternak v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016) ("The [prima facie] elements of a fraud cause of action consist of [1] a misrepresentation or a material omission of fact [2] which was false and known to be false by defendant, [3] made for the purposes of inducing the other party to rely upon it, [4] justifiable reliance of the other party on the misrepresentation or material omission, and [5] *injury*." (emphasis added). Similarly, to state a legal or equitable claim for contract recovery under New York law, a party must plausibly plead "damages," equally so for Paul's legal contract claims and Paul's implied warranty claim. *See Int'l Bus. Machines Corp. v. Dale*, 2011 WL 4012399, at *4 (S.D.N.Y. Sept. 9, 2011). In both cases, a failure to allege facts suggesting the plausible inference that there were "damages to the [claimant] caused by defendant's breach" of a contractual or common law tort duty requires dismissal. *Diesel Props S.r.l. v. Greystone Bus. Credit II, LLC*, 631 F. 3d 42, 52 (2d Cir. 2011).

### B.    Applicability of Collateral Estoppel

Two federal courts — one bankruptcy court and one district court sitting in review — have examined the issue of valuation and determined that the Property was not worth more than

$53 million.  The Court turns to an examination of each of the requirements of collateral estoppel.

> ### 1.      Identical Issue

The issue of the Property's valuation — including the specific finding that it was at most worth $53 million — was raised in the bankruptcy proceeding.  As described above, the bankruptcy court heard evidence on this issue presented by the parties in the present litigation as well as additional non-parties.

Paul, however, argues that the issue before the bankruptcy court was different — that it pertained exclusively to a temporally limited assessment of the Property's market value at or around the time of the foreclosure (November 2020).  (*See* Opp. at 19.)  Paul also raises an argument that the same issue was not before the bankruptcy court because he has alleged additional facts going to the Property's value in his Answer.  (*See* Opp. at 18.)

Paul's arguments are meritless.  First, Paul relies on evidence and allegations that he previously offered before — and that were considered and rejected by — the bankruptcy court. *See supra* I.C (rejecting challenges to valuation based on (1) a purported offer for financing at $80 million, (2) certain shareholder statements, (3) a previous bid at an unconsummated foreclosure sale that was significantly more than $53 million, (4) allegations of fraud on the court/receiver).  In fact, the bankruptcy court considered all these arguments — along with both Paul's personal valuation and that of his expert — and found them without merit, often because Paul or Borrower had misrepresented what minimal factual basis they had for the conclusions. Thus, even if Paul were somehow right that a court's holding assigning a monetary valuation figure to an asset cannot bar some degree of relitigation of the correctness, in the future, of that valuation judgment, Paul would still be collaterally estopped from raising all of the attacks on the

$53 million figure that he raised in the bankruptcy.  Because he does not raise new factual arguments here, that claim fails.

Second, Paul's argument is legally erroneous as applied in this case.  While Paul cites no cases or other authorities in his submission on the preclusive effect of the bankruptcy order, he gestures at a truism:  that there are some situations in which a significant intervening change in underlying facts can defeat the application of preclusion.  *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28.

But this truism represents the exception, not the norm.  "When an issue of *fact* or *law* is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the conclusion is conclusive in a subsequent action between the parties." *Karaha Bodas Co., LLC. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 122 (2d Cir. 2007) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27) (internal quotation marks omitted).  The default assumption, in other words, is that, provided the issues are the same, a party cannot end-run issue preclusion by speculating that a factual change may have occurred but failing to *actually allege* what that factual change is.  Under Second Circuit precedent, in order to escape the preclusive effect of a prior final judgment on the basis of an intervening change in fact, the party opponent must mount "a viable direct attack" on the earlier judgment, alleging facts that would render that judgment erroneous, illogical, or unjust given changes to the underlying status quo ante in the two cases.  *Campaniello Imports Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 661–63 (2d Cir. 1997).

All that Paul says is that it is possible that the valuation of the Property has changed in the intervening two and a half years.  But that does not suffice.  Paul does not allege facts sufficient, even at this stage, to suggest any plausible means to "directly attack" the factual

assumptions of the bankruptcy court's order.  Paul fails to allege any plausible basis for an

attack, and certainly not a viable and direct one, on any specific factual assumption relied upon

or otherwise informing the decision of the bankruptcy and district courts in Texas.[7]

Therefore, the familiar and general rule, as understood by this circuit, applies and

disposes of these arguments:  When "the party against whom preclusion is sought did in fact

litigate an issue of ultimate fact and suffered an adverse determination, *new evidentiary facts*

*may not be brought forward to obtain a different determination of that ultimate fact . . . .*"

*Bodas*, 500 F.3d at 122 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c) (alteration

in original) (emphasis added).

### 2.    Actually Litigated and Decided

The issue of the Property's valuation was actually litigated and decided by the

bankruptcy court.  As detailed above, the court had two full days of adversarial hearings which

largely probed the bottom-line value of the Property.  Paul participated in this proceeding as

creditor, whole owner of debtor, and witness.  Both parties presented fact evidence and put on

expert appraisal testimony.  The bankruptcy court held that the Property was worth $53 million

---

[7] Paul does make several assertions which he claims constitute new facts, but none of these assertions alter the analysis.  Specifically, Paul asserts that the bankruptcy court did not consider "a refinancing proposal in the amount of $85,000,000" which, if accurate, would suggest that there was equity in the property. (Opp. at 19 – 20).  Paul is simply wrong on this point; the bankruptcy court made specific findings that this "proposal" could not be verified, was far too indefinite, and lacked reliability.  May 4, 2021, Hrg. Tr. on Motion to Reinstate the Automatic Stay at 14:14–25, *In re Silicon Hills Campus, LLC*, No. 20–10042–TMD, Dkt. 357 (Bankr. W.D. Tex. May 4, 2021).  Second, Paul asserts that failed bids at a previous, aborted foreclosure sale, which exceeded $53 million in value, would similarly have shown equity in the property.  (Opp. at 19.)  This argument fails not only because the bankruptcy court did consider and reject the argument but also because, under New York law, failed auction bids cannot provide a legal basis to establish a property's market price.  Rather, "mere offers to purchase or unconsummated contingent contract prices" and, crucially, "unsuccessful auction bids" are "not sales and are no[t] . . . dispositive of the property's value." *Adirondack Tr. Co. v. Ros Assocs.*, 144 A.D.2d 827, 828 (3d Dept. 1988).

at most, and that it therefore lacked any equity because liabilities against the Property were worth much more than $53 million.

Significantly, the district court affirmed the bankruptcy court's order lifting the stay.  It would have been legal error for the bankruptcy court to lift the stay without permitting litigation and deciding the issue of the Property's valuation.  Although preclusive effect from a bankruptcy court's decision as to whether to lift an automatic stay under 11 U.S.C. § 362(d) is generally "not a bar" due to the statutorily limited scope of a hearing, the value of the property and of the liens against it is one of the "necessary" issues that the court must decide.  The bankruptcy court therefore necessarily decided it.  *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30–31 (2d Cir. 1994) (internal citations omitted); *In re Johnson*, 756 F.2d 738, 740 (9th Cir. 1985), *cert. denied*, 474 U.S. 828 (1985).  Indeed, the Bankruptcy Code itself makes clear that "the adequacy of protection for the creditor, the debtor's equity [if any] in the property, and the necessity of the property to an effective reorganization" must be actually litigated and necessarily decided.  *Grella*, 42 F.3d at 31 (quoting § 362(d)).

### 3.    Full and Fair Opportunity to Litigate the Issue

This factor, as applied to the instant facts, is best disaggregated into two questions: first, whether there is identity of parties between the bankruptcy proceeding and this one; and second, whether, if Paul is considered a party to the previous proceeding, he had a full and fair opportunity to litigate the issue of valuation therein.

*First*, Paul does not contest that he is properly treated as a party for purposes of collateral estoppel because he was in privity with the Borrower.  While Paul did himself appear and testify at the bankruptcy hearing, the Court need not rely on that fact, because it is clear that Paul was, at minimum, in privity with Borrower.  *See Wenegieme v. U.S. Bank Nat'l Ass'n*, 2017 WL 1857254, at *9 (S.D.N.Y. May 4, 2017), *aff'd*, 715 F. App'x 65 (2d Cir. 2018) (holding that

issue preclusion applies to any "issue . . . decided against [a] party or those in privity").  This is plainly established because Paul acted as Guarantor for Borrower firm's loan obligations.  And in New York, "[t]he law is well settled that guarantors of payment of a corporate debt. . . are in privity with the corporate borrower and therefore bound by a judgment against the corporation." *Superior Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1470 (S.D.N.Y. 1990).

*Second*, Paul's privy, the Borrower, had a full and fair opportunity to litigate the Property's valuation in the bankruptcy proceeding.  Distinguishing the "opportunity" element from the "actually litigated" element is subtle and requires this Court to inquire whether Paul and/or Borrower "was fully able to raise the same factual or legal issues" in the prior proceeding. *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2004).

Here, it is beyond dispute that Paul's privy had a full and fair opportunity to litigate the issue of the Property's valuation in the bankruptcy proceeding.  Under Section 362(d), before lifting an automatic stay, the bankruptcy court must establish the extent of a debtor's "equity" in the property.  The equity determination, as a definitional matter, necessarily includes establishing an asset's valuation.  *See In re New Era Co.*, 125 B.R. 725, 728 (S.D.N.Y. 1991) ("Equity in this context refers to the 'difference between the property value and the total amount of liens against it." (internal citations and quotation marks omitted)).

Additionally, the facts show extensive litigation:  Borrower was afforded two full days for an evidentiary, adversarial hearing on the very issue if equity.  During this hearing, all parties put on expert witnesses who testified as to their appraisal of the Property.  One such witness was Natin Paul himself.  Borrower, further, had the opportunity to and actually did cross-examine each other's expert and fact witnesses, and they similarly put on closing arguments.

Finally, all of the above analysis is confirmed by how Paul pleaded his counterclaims and briefed his opposition to the instant motion: Paul has not raised *any* new argument — factual, legal, or otherwise — that was not possible to raise and actually raised, and rejected, by the bankruptcy court when Borrower raised the same arguments there.

### 4.    Necessary to Support a Valid and Final Judgment on the Merits

The above discussion also establishes that the issue of valuation was necessary to the bankruptcy court's final judgment lifting the stay. Still, Paul argues that the "procedural posture of th[e] [bankruptcy] proceeding render[s] that Court's holding inapplicable here" because the bankruptcy court "was determining whether a reorganization plan was feasible in November." (Opp. at 18.) Though Paul does not phrase or analyze this argument as such, the Court understands this argument to fit into the requirement of federal collateral estoppel that the issue be "necessary to the disposition" in the first proceeding.

As explained above, however, the bankruptcy court issued holdings regarding two distinct issues, one of which was a legal and logical necessary condition and basis for the other. Contrary to Paul's assertion, that court made a separate and primary determination of the Property's value — its valuation — and only then moved onto the secondary issue regarding whether Paul or Borrower had any feasible reorganization plan. *See supra* I.C. Paul's argument is unpersuasive as it misstates bankruptcy law and procedure. While it is true that the bankruptcy court reached conclusions in the same order about the overall feasibility of reorganization, it is also true that it did so relying on its own finding as to valuation.

Moreover, this argument does not ultimately help Paul. If ATX is wrong in framing this issue for the reasons Paul says, then Paul is equally wrong. Contrary to Paul's assertions, the bankruptcy court was not ultimately determining the timeliness of any reorganization, either. Rather, it was determining whether to lift the automatic stay. To lift such a stay under the Code,

17

the Lender bore the burden of establishing that the Borrower had no surviving equity interest in

the Property, a determination which itself required the Court to make specific findings as to the

property's value and the outstanding debts against it.  *See* 11 U.S.C. § 362(d)(2).  This is also the

only way in which federal courts have interpreted the relevant provision that the Court has been

made aware of:  The generally accepted view is that a "determination of property values" would

be one of the "central" matters a court must determine for any "decision whether [a] stay in

bankruptcy may be lifted under section 362(d)(2)."  *In re Sutton*, 904 F.2d 327, 329 (5th Cir.

1990); *accord In re Westchester Ave. Marina Realty, Inc.*, 124 B.R. 161, 165–66 (Bankr.

S.D.N.Y. 1991) (citing and endorsing *Sutton* and explaining that to obtain relief from an

automatic stay, a creditor would bear the burden of "establish[ing] that the debtor lacks equity in

the subject property" by assessing its value and the liens against it); *In re Melgar Enters., Inc.*,

151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993) (same).

### C.      Unclean Hands

Last, Paul argues that because collateral estoppel is an equitable doctrine, ATX should be

denied the chance to assert it because, due to ATX's allegedly fraudulent actions and statements

related to the receivership and Chapter 11 proceedings, its hands are "unclean."  (*See* Opp. at 16;

Answer ¶¶ 95, 99, 113.)  This argument is also without merit.  Paul makes a series of question-

begging and tautological assertions that ultimately rest on a misunderstanding of the nature of

Anglo-American adversarial litigation.[8]  *See King v. First Am. Investigations, Inc.*, 287 F.3d 91,

---

[8] The "fraud on the court" aspects of Paul's counterclaims are insufficient as a matter of law irrespective of issue preclusion.  *See Weldon v. United States*, 2000 WL 1134358, at *2 (2d Cir. 2000) ("[F]raud upon the court will lie only where a party has submitted false or forged documents. . . or conduct that might be thought to corrupt the judicial process itself, as where a party bribes a judge or inserts bogus documents into the record.") (citations and quotations omitted); *Manti's Transp., Inc. v. Citicapital Comm. Corp., Inc.*, 2008 WL 977192, at *9 (E.D.N.Y. Apr. 9, 2008) ("Moreover, plaintiff's allegations that defense counsel made

95–96 (2d Cir. 2002) (holding plaintiff's allegations of fraud on the court were "no more than

complaints that the defendants disputed the plaintiff's version of law and facts," which is

"exactly what is expected in the normal adversary process").  Here, the adversary process

happened, and it produced an issue-preclusive judgment.  Because all of Paul's counterclaims

reflect an attempt to relitigate that judgment, those counterclaims fail.

## IV.   Conclusion

For the foregoing reasons, Plaintiff ATX Debt Fund 1, LLC's motion to dismiss

Defendant Natin Paul's counterclaims is GRANTED.  The counterclaims are hereby

DISMISSED with prejudice.

The Clerk of Court is directed to close the motion at ECF Number 67.

SO ORDERED.

Dated: March 21, 2023
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

misleading statements in his pleadings and motions are insufficient to state a claim for fraud on
the court.").